# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 23, 2001 Session

## STATE OF TENNESSEE v. THOMAS J. FAULKNER, JR.

**Appeal from the Circuit Court for Grainger County**
No. 3266     Rex Henry Ogle, Judge

---

### No. E2000-00309-CCA-R3-CD
### April 17, 2001

---

Thomas J. Faulkner, Jr. stands convicted of four counts of attempted first degree murder and one count of theft over $1,000. He received his sentence at the conclusion of a jury trial in the Grainger County Circuit Court and is presently serving an effective 73-year sentence for these crimes. In this direct appeal, he raises numerous issues related to admission of evidence, release of a juror, sufficiency of the evidence, severance, jury instructions and sentencing. Upon review, we are unpersuaded of error and therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JOSEPH M. TIPTON, J., filed a concurring opinion.

Carl R. Ogle, Jr., Jefferson City, Tennessee, for the Appellant, Thomas J. Faulkner, Jr.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; Michael A. Gallegos, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Thomas J. Faulkner, Jr. appeals from his convictions of four counts of attempted first degree murder and one count of theft of property valued over $1,000 but less than $10,000. Faulkner was tried jointly with Teddy, Terry and Ronnie Ogle in the Grainger County Circuit Court,[1] but only Faulkner's convictions are before us in this direct appeal. Faulkner raises numerous issues for our review:

---

[1] An additional co-defendant, Allison Christine Hurt, was not tried with Faulkner and the Ogles. At the time of Faulkner's trial, Ms. Hurt's case had not yet proceeded to trial.

1. Whether the trial court released a juror in violation of Tennessee Rule of Criminal Procedure 24.
2. Whether the trial court erred in allowing the state to question a law enforcement officer about his investigation such that the jury was alerted to the fact that one or more of the defendants had additional charges pending.
3. Whether the trial court should have excluded the testimony of state's witness Kenny Lowery because his prior statements were not provided to the defense until the morning of trial.
4. Whether sufficient evidence supports three of the four attempted first degree murder convictions.
5. Whether the trial court committed plain error in allowing evidence and argument which violated *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968).
6. Whether the trial court should have severed Faulkner's case from that of his Ogle co-defendants.
7. Whether the trial court erred in failing to submit supplemental jury instructions to the jury in writing.
8. Whether the trial judge erred in informing the jury of the time at which he would end deliberations for the evening.
9. Whether Faulkner received an excessive sentence.

We have heard the parties' oral arguments, and we have reviewed the record, the briefs of the parties, and the applicable law. All of the defendant's urgings of error are unavailing, however, and we affirm the judgment of the trial court.

In the light most favorable to the state, the evidence at trial demonstrated that Allison Christine "Chris" Hurt wanted her husband's ex-wife, Judy Hurt, killed so that she could live in the home occupied by Judy Hurt. Chris Hurt promised Faulkner and the Ogles the pick of the personal property at the Judy Hurt residence if they would kill Judy Hurt.

Thereafter, with the assistance of Kenny Lowery, the Ogles and Faulkner located Judy Hurt's home. Later the same evening, they returned without Lowery. Around 9:00 p.m., Ted and Ronnie Ogle went to the door posing as prospective buyers of Judy Hurt's home. They asked to view the interior of the home, but Ms. Hurt told them her daughter was in bed sick, it was too late, and they should contact the real estate agent.

Judy Hurt was home that evening with her daughter, Angel Olsen, her son-in-law, Rick Olsen, and her granddaughter, Haley Olsen. Rick Olsen was on the living room sofa when Ms. Hurt answered the door to Ted and Ronnie Ogle.

That night, the defendants lay in wait outside the Hurt home until all of the lights were out. They cut the phone lines to the home. Sometime between approximately midnight and 2:00 a.m., Faulkner, Ted Ogle and Terry Ogle opened fire on the first floor of the home, where all

four of the victims were asleep. Two-year-old Haley Olsen suffered two bullet wounds. One of the bullets lodged in her pelvic area and could not be removed by medical personnel. Judy Hurt sustained a gunshot wound to the elbow. The hail of gunfire so badly damaged the sheetrock walls that the dust from loose sheetrock made "smoke" throughout the house. The bullets penetrated a hot water heater, and hot water sprayed into the home.

Immediately after this assault, Faulkner, Ted and Terry Ogle fled the scene in Rick Olsen's truck. Once the defendants were all gone, the victims went to Jefferson City Hospital, where Judy Hurt and Haley Olsen were treated for their injuries. Haley Olsen had to be transported to University of Tennessee Medical Center in Knoxville due to the extent of her injuries.

Faulkner acknowledged in a statement given to law enforcement, "Our plan was to kill everyone in the house and steal the stuff in it. I was supposed to shoot in a window with Terry and the people were going to be shot by Ted as they ran to the front of the house." He also admitted shooting into the house and taking the truck.

The defendant's version of events at trial was that he was a minimal player in the crimes. He claimed that he had no recollection whether Chris Hurt asked him to kill Judy Hurt. He said his only intent in going to Judy Hurt's home was to steal property. He specifically disavowed any intent to injure anyone, and he claimed that there were many facts in his pretrial statement that were untrue. Faulkner testified that he was extremely intoxicated on the night of the crimes and had no memory of portions of the evening while he was at the Hurt residence.

On these facts, the jury convicted Faulkner of four counts of attempted first degree murder and one count of theft of property over $1,000. The trial court sentenced the defendant to an effective 73-year term. The defendant then filed this appeal.

## I

The defendant's first claim is that the trial court erred in releasing a juror. Early in the trial, the state alleged that the juror in question had been in contact with Chris Hurt, who was charged relative to the crimes in this case but was to be tried separately. The state also alleged that this juror had talked to Chris Hurt's family members. Further, the state claimed that this juror had been seen looking at the defendant Faulkner's father "sort of like everything's okay or whatever" as the juror left the jury box the previous day. The trial court conducted an in-chambers hearing to inquire into the allegations, and that hearing has not been transcribed in the trial transcript.[2] However, the court observed on the record that Judy Hurt, her daughter and her friend advised the court in chambers that they had seen the juror talking to members of Faulkner's family and a co-defendant who was not on trial. At that time, the court decided not to excuse the juror because it

---

[2]The state made its allegation before the jury was sworn; however, it is not clear whether the in-chambers inquiries were made before or after the jury was sworn. Clearly, however, the juror was examined in open court and excused after the jury had been sworn.

"was satisfied that she was a fair and impartial juror and could therefore go on." The juror later requested a further conference with the trial judge, and the court conducted a second off-the-record, in-chambers hearing. The court's comments about that hearing indicate that the juror felt like she had been singled out. The court then considered the issue in open court, at which time the juror said she did not want "everything to be a mess because of [her]." She said she could listen to the case with an open mind and thought she could be fair. However, she said, "I just don't want to mess up no [sic] process and make anybody feel like they wasn't [sic] fairly tried." Over the objection of all four defendants on trial, the court dismissed the juror based upon the juror's feeling that she felt uncomfortable and singled out. The court specifically noted, however, that it had no question about the juror's honestly and integrity.

Tennessee Rule of Criminal Procedure 24(e)(1) allows the trial court to replace a sitting juror who "become[s] or [is] found to be unable or disqualified to perform [his or her] duties" with an alternate juror. Whether to excuse a juror and elevate an alternate juror to the status of regular juror is a matter for the trial court's discretion. *State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991). On appeal, the defendant bears the burden of demonstrating prejudice from the substitution. *State v. Max*, 714 S.W.2d 289, 294 (Tenn. Crim. App. 1986). While the defendant has a right to a fair trial at the hands of an impartial jury, he has no right to have his case decided by any particular jurors. *See State v. Smith*, 857 S.W.2d 1, 20 (Tenn. 1993).

Because it is determinative, we move directly to the prejudice prong of the inquiry. In that regard, the defendant has failed to articulate any prejudice which befell him as a consequence of the court's excusing the juror in question. He claims simply that his "vigorous efforts at trial to have the court maintain [the juror in question] as a member of the panel serve as a sufficient showing of prejudice." We fail to see how this is a demonstration of prejudice. *See State v. Stacy Dewayne Ramsey*, No. 01C01-9412-CC-00408, slip op. at 30 (Tenn. Crim. App., Nashville, May 19, 1998) (defendant who did not allege that juror who replaced excused juror was less than impartial failed to establish prejudice), *perm. app. denied* (Tenn. 1999); *State v. Claudette Pittman Bordis*, No. 01C01-9211-CR-00358, slip op. at 34 (Tenn. Crim. App., Nashville, Dec. 1, 1994), *perm. app. denied* (Tenn. 1995); *Millbrooks*, 819 S.W.2d at 444-445 (defendant who objected to trial court's discharge of juror failed to allege and prove resultant prejudice).

Because a defendant must establish both an abuse of discretion in excusing a juror *and* resultant prejudice, a defendant who fails to establish prejudice fails to sustain his claim. Such is the case here.

## II

The defendant's next issue is whether the trial court erred in allowing the state to question a law enforcement officer about his investigation such that the jury was alerted to the fact that one or more of the defendants had additional charges pending. This issue relates to the testimony of Jefferson County, Tennessee Sheriff's Deputy G.W. "Bud" McCoig and TBI Firearms Examiner Steve Scott. Detective McCoig testified that he assisted Grainger County authorities in

investigating the shooting at Judy Hurt's home. This investigation led him to locate the Ogle co-defendants in Birmingham, Alabama. Upon his discovery and apprehension of the Ogles in Alabama, certain firearms were recovered. This testimony set the stage for Agent Scott's testimony that various forms of ammunition recovered from Judy Hurt's property and her wound had been fired from and/or chambered in three firearms recovered with the Ogles in Alabama. The defendant also makes a vague argument about implication in this evidence relative to "the murder charges against the co-defendants in this matter in Jefferson County." Although this argument is not precisely articulated, we presume that the defendant is concerned that the jury might infer from the involvement of a Jefferson County officer in this Grainger County case that one or more of the defendants was involved in other crimes in Jefferson County.[3]

The defendant argues that this evidence was inadmissible under Tennessee Rule of Evidence 404(b). Rule 404(b) provides that evidence of a defendant's prior crimes, wrongs or acts is not admissible to prove that he committed the crime in question. Tenn. R. Evid. 404(b). The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id.*; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). Nevertheless, evidence of a defendant's prior crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Such material issues include "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn R. Evid. 404, Advisory Comm'n Comments.

Upon consideration of the evidence offered via the testimony of Detective McCoig and Agent Scott, we fail to appreciate that there was any actual or implied evidence of other crimes of the defendant Faulkner or his Ogle co-defendants. The evidence of weapons possession was not, in the manner presented, evidence of criminal conduct. There was no evidence that these weapons were unlawfully possessed by the Ogles. Further, the testimony of Detective McCoig was presented in terms of his "assisting with the Grainger County Sheriff's Department in the investigation surrounding the shooting of the Judy Hurt home there in Grainger County." The jury was unaware through the testimony of these witnesses of any independent Jefferson County investigation relative to other crimes, and we are unconvinced that they were invited by the testimony to speculate in that regard. Without evidence of other crimes, the defendant's Rule 404(b) challenge must fail.[4]

---

[3]To the extent that we may have misapprehended the defendant's brief and imprecise argument on this point, our consideration of it is waived. *See* Tenn. R. Ct. Crim. App. 10(b) (issues which are not supported by argument will be treated as waived).

[4]Our conclusion that Rule 404(b) does not apply pretermits consideration of the defendant's companion claim that the court erred in failing to hold a hearing on the admissibility of the evidence. Where Rule 404(b) is inapposite, so is its requirement of a hearing. However, we note that the trial court is required to hold a hearing on the admissibility
(continued...)

Because Rule 404(b) is inapplicable here, we have also considered the possibility of the evidence being barred by Rule 403, which provides for exclusion of relevant evidence where its prejudicial value substantially outweighs its probativeness. *See* Tenn. R. Evid. 403. Upon striking that balance, however, we see no prejudicial value in contrast to the great probative value of the challenged evidence.

The trial court did not err in admitting this evidence.

**III**

Faulkner argues next that the trial court should have excluded the testimony of state's witness Kenny Lowery because certain materials relative to this witness were not provided until the morning of trial. He makes numerous claims of prejudice which essentially amount to allegations of inability to properly review the information and prepare for trial. In a summary response that contains no citation to authority, the state acknowledges its tardiness in providing the defendant with Lowery's prior statement but concludes that the defendant has not shown prejudice.

We begin by identifying the documents in question. The defendant claims they consist of "various material . . . including a statement of . . . Kenny Lowery." The record contains an exhibit identified as "*Jencks*" material. Four documents within this exhibit pertain to witness Lowery. They are a written agreement for testimony, a written statement attached as an exhibit to the agreement, an admonition and waiver of rights form attached as an exhibit to the agreement, and a statement signed by three law enforcement officers detailing an interview of Lowery conducted in the district attorney's office. The written agreement is signed by Lowery, his attorney and an assistant district attorney, and pursuant to its terms, Lowery agrees to testify truthfully in all trials involving the Ogles, Faulkner and Chris Hurt. Lowery acknowledges the veracity of the factual statement that is attached. As its part of the bargain, the state agrees to certain bond arrangements, which according to other evidence enabled Lowery to be released from jail. Faulkner's complaint in his motion for new trial and his argument in his appellate brief focus on his inability to investigate the circumstances surrounding the interview of Lowery that took place in the district attorney's office, at which time this agreement was made. Faulkner posits that during cross-examination of witness Lowery, "it became apparent that the Attorney General and law enforcement officers might have influenced the witness's statement."

The defendant claims that this issue is controlled by Tennessee Rule of Criminal Procedure 26.2, the basis of which is *Jencks v. United States*, 353 U.S. 657, 77 S. Ct. 1007 (1957). He also claims that his Sixth Amendment rights to compulsory process and confrontation "are implicated in the violation of the procedural guarantees of Rule 26.2." However, he articulates no

---

[4](...continued)
of Rule 404(b) evidence only *upon request*. Tenn. R. Evid. 404(b)(1). The defendant in this case failed to request a Rule 404(b) hearing, so even if the rule did apply, the defendant would not be entitled to relief simply because the court did not conduct a hearing.

free-standing constitutional claim aside from the Sixth Amendment underpinnings of Rule 26.2.

Rule 26.2 requires production of a prior statement of a witness other than the defendant *after* the witness has testified on direct examination. Tenn. R. Crim. P. 26.2(a) (emphasis added); *see* Tenn. Code Ann. § 40-17-120 (1997). The statement in this case was produced prior to Lowery even taking the stand. Thus, neither Rule 26.2 nor any underlying constitutional concerns are implicated.

Although not urged to do so by the defendant, due to the constitutional claim asserted we have considered this issue within the framework of pretrial discovery of exculpatory evidence. In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), the United States Supreme Court held that due process requires the prosecution to furnish exculpatory evidence to the accused upon request. Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S. Ct. at 1196-97; *see* Tenn. R. Crim. P. 16 (discovery). The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *State v. Marshall*, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); *Branch v. State*, 4 Tenn. Crim. App. 164, 168, 469 S.W.2d 533, 536 (1969). In *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the *Brady* rule. *Cf. Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972) (nondisclosure of state's deal with witness violated defendant's due process rights). Although *Brady* does not normally apply to evidence that was the subject of a merely tardy disclosure, as opposed to a failure to disclose altogether, a *Brady* analysis is apt where the defendant claims the delay itself has caused prejudice. *State v. Joan Elizabeth Hall*, No. 01C01-9710-CC-00503, slip op. at 19 (Tenn. Crim. App., Nashville, Jan. 28, 1999), *perm. app. denied* (Tenn. 1999).

Before an accused is entitled to relief under *Brady*, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. *See Bagley*, 473 U.S. at 674-75, 105 S. Ct. at 3379-80; *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97; *Workman v. State*, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); *Marshall*, 845 S.W.2d at 232; *Strouth v. State*, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). In *State v. Spurlock*, this court recognized a fourth prerequisite to relief, that "the accused must make a proper request for the production of the evidence, unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused." *State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993) (citations omitted). The defendant bears the burden of proving a *Brady* violation by a preponderance of the evidence. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).

Without question, the evidence was suppressed by the prosecution in the sense that it was not disclosed until the day of Lowery's testimony. The more difficult issues are whether the evidence is both favorable and material to the defendant. The defendant has failed to demonstrate either by a preponderance of the evidence. We accept the premise that the existence of a witness's

agreement with the state appears, at first blush, to be favorable and material evidence for the defense. First, we note that a "deal" between the state and an individual whose resulting testimony would be damaging to the defendant is not in and of itself material or exculpatory unless the dealmaker testifies. Next, the defendant has not claimed that Lowery's agreement with the state was an issue of bias that was not disclosed to the jury. Indeed, the defendant thoroughly explored the issue of the bond agreement during his cross-examination of Lowery. Rather, the defendant maintained that Lowery may have been coerced into making the agreement and the statement that is incorporated therein. However, the record fails to demonstrate that the defendant ever developed his theory beyond mere suspicion. Defense counsel thoroughly cross-examined Lowery at trial about whether he felt pressured at the meeting in the district attorney's office and about the terms of the agreement. Even if we assume that the defendant was hampered in his ability to develop evidence of coercion via other potential witnesses at trial, we are constrained to note that he had the opportunity to investigate and develop evidence of a coercion theory prior to the motion for new trial. However, the record reflects that at the motion for new trial he rested upon bare allegations without presenting any evidence to support them. As such, he failed to demonstrate to the trial court that the late-disclosed materials were favorable and material beyond the extent to which he was able to demonstrate through cross-examination at trial.[5] With only his unsubstantiated allegations in the appellate record, he likewise fails to carry his burden on appeal.[6]

In so holding, we have not overlooked the possibility that Tennessee Rule of Criminal Procedure 16 provides that a party's failure to comply with discovery may be cause for a continuance or exclusion of the evidence. *See* Tenn. R. Crim. P. 16(d)(2). The defendant, however, made no claim under Rule 16 in the trial court, and he does not advance that basis on appeal. Any consideration of the issue under the auspices of Rule 16 is therefore waived. *See State v. Reginald C. Johnson*, No. 03C01-9801-CC-00006, slip op. at 9 (Tenn. Crim. App., Knoxville, Mar. 17, 1999) (Rule 16 issue waived on appeal where defendant failed to object on that basis in trial court), *perm. app. denied* (Tenn. 1999). Even if the issue were properly before us, we would be hard-pressed to find an abuse of the trial court's discretion in allowing Lowery to testify.

Even though the trial court indicated its belief that the state should have disclosed the Lowery documents at an earlier time, we are not as certain that the state was obliged to disclose the material as a function of the discovery rule. *See* Tenn. R. Crim. P. 16(a). The state is required, upon request, to furnish the defendant with a copy of the defendant's own statement and a copy of any statement made by a codefendant who is on trial jointly with the defendant. Tenn. R. Crim. P. 16(a)(1)(A). Not only is the state not required to furnish the defendant with statements made by other persons, the rule specifically "does not authorize the discovery ... of statements made by state witnesses or prospective state witnesses." Tenn. R. Crim. P. 16(a)(2); *see* Tenn. R. Crim. P. 26.2(a)

---

[5]To the extent that the defendant was able to utilize the evidence at trial, he was not prejudiced by the untimely disclosure. Therefore, we concern ourselves only with any materiality and favorability that could not be shown at trial due to the belated disclosure.

[6]Like the trial court, we are troubled by the state's suppression of the evidence in question. On different facts, our result might likely favor the defendant.

(providing for the disclosure, upon request, of a testifying witness's statement that is in the sponsoring party's possession and that "relates to the subject matter concerning which the witness has testified"). Lowery was not a codefendant for the purposes of Rule 16. Thus, to the extent that the Lowery material consists of Lowery's pretrial statement, it is not discoverable via Rule 16.

Of course, the material in its entirety was an agreement between Lowery and the state. As such, it is plausible to view the material as a "document," which upon the defendant's request is discoverable *if* it is "material to the preparation of the . . . defense." Tenn. R. Crim. P. 16(a)(1)(C). As shown above, however, Lowery's "deal" with the state would neither be material nor exculpatory until Lowery became a witness at trial. In the present case, the dealmaker Lowery did testify, but the material was disclosed to the defense in advance of Lowery's testimony. If the "deal" documents were discoverable via Rule 16(a)(1)(A), the state had a continuing duty to disclose the deal when it became material. Tenn. R. Crim. P. 16(c); however, we cannot discern from the record before us that the state failed to fulfill its Rule 16 duties. Certainly, the record belies any claim of plain error. *See* Tenn. R. Crim. P. 52(a).

**IV**

In his next issue, Faulkner claims that three of the four attempted first degree murder convictions are not supported by sufficient evidence. He argues that the record is devoid of evidence that he knew anyone other than Judy Hurt was in the house, and therefore, he could not possess the intent to kill anyone other than her.

When a defendant challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); Tenn. R. App. P. 13(e); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). On appeal, the defendant no longer enjoys the presumption of innocence and therefore has the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record

as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

First degree murder as prosecuted in this case is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2000). Attempt, as relevant to first degree murder, occurs when a person, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with the intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." Tenn. Code Ann. § 39-13-101(a)(2) (1997).

We begin our analysis by rejecting the defendant's premise that the state must present evidence that the defendant had knowledge of each victim's presence and had a specific intent to kill each victim in order to sustain a conviction of attempted first degree murder as to each victim. Our supreme court has recently observed that the relevant statutes defining first degree murder and the "intentional" element of that crime do not require that a defendant's conscious objective be to kill a specific victim. *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999). Rather, what is required is that the defendant have the conscious objective to kill "a person." *Id*.

According to the defendant's pretrial statement, "Our plan was to kill everyone in the house and steal the stuff in it." Two of the Ogles went to Ms. Hurt's door and learned that there were at least two other individuals in the home. The defendant saw two vehicles on the property. One or more of the defendants cut the phone lines to the house. After several hours of watching the home and lying in wait, the defendant, Ted Ogle and Terry Ogle opened fire on the home. Viewed in the light most favorable to the state, this evidence demonstrates that the defendant had the premeditated intent to kill everyone in the Hurt home. It matters not that he was unaware of the identity of each individual or even the exact number of individuals present. In this case, Faulkner and his co-defendants had the conscious objective to kill as many people as necessary to accomplish the goal of seeing everyone in the house dead and stealing the items of value inside the home.

The record supplies additional support for the convictions relative to Rick and Angel Olsen, as well, based upon Faulkner's criminal responsibility[7] and two of his co-defendants actual knowledge of their presence. Ted and Ronnie Ogle went to Ms. Hurt's door, where they saw Ms. Hurt and Rick Olsen. Ms. Hurt told the Ogles that her daughter was sick in bed. Combined with the facts recited above relative to lying in wait, the cut phone line, and the armed assault on the

---

[7]A defendant is criminally responsible for the conduct of another when he, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (1997).

house, this evidence demonstrates that, as an alternative theory of guilt, the defendant was criminally responsible for Ted Ogle's attempted first degree murder of Rick and Angel Olsen.[8]

## V

The next issue raised by the defendant actually involves several claims under the tenets of *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968). In *Bruton*, the Supreme Court held that admission of a statement of a non-testifying co-defendant which incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation. *Bruton*, 391 U.S. at 126, 88 S. Ct. at 1622 (1968); *see* U.S. Const. amend. VI.; Tenn. Const. art. 1, § 9; *Smart v. State*, 544 S.W.2d 109, 112 (Tenn. 1976).

The defendant's *Bruton* claims are as follows. First, he claims that the trial court committed plain error in allowing the prosecutor to "read extensively" from the statement of an unidentified "codefendant not on trial." He also alleges a *Bruton* violation resulted when Investigator Hutchison read portions of an unidentified co-defendant's statement. Faulkner also alleges *Bruton* error resulted from a state's rebuttal witness reading "significant portions" of the defendant's statement for no purpose other than to refresh the jury's memory just prior to deliberations. Finally, Faulkner claims *Bruton* was violated when the attorney general referred to and read portions of the statement of an unidentified "co-defendant" in his rebuttal argument. In response to the state's argument that these matters were not the subject of objection at trial and are therefore waived, the defendant asks us to notice them as plain error.[9] *See* Tenn. R. Crim. P. 52(b); *State v. Cameron*, 909 S.W.2d 836, 853 (Tenn. Crim. App. 1995).

We first consider the defendant's claim of *Bruton* error when the prosecutor "read extensively" from a statement of a "codefendant not on trial." The defendant's argument is deficient in precisely identifying the issue he wishes to place before the court. In his brief, Faulkner does not identify the co-defendant not on trial to which he is referring. In the motion for new trial he raised an issue of this nature and referred to Chris Hurt. However, he might also be referring to Kenny Lowery. None of the citations to the record in the defendant's brief and reply brief identify the allegedly objectionable material. Because Faulkner says the witness was not available for cross-examination and because Kenny Lowery testified at trial, we will presume that this issue pertains to Chris Hurt. To the extent that the issue may be raised in relation to Kenny Lowery, our consideration of it is waived. *See* Tenn. R. Ct. Crim. App. 10(b).

---

[8] Additionally, there is evidence demonstrating the defendant's direct knowledge of Rick Olsen's presence. In a statement given to law enforcement officers, the defendant admitted that he knew that Ms. Hurt and "some old guy" were in the house. Given this evidence, it is questionable whether it is even necessary to resort to a criminal responsibility theory to inculpate the defendant for the crime against Rick Olsen.

[9] Some of these issues were at least arguably raised in the motion for new trial, although they were raised as general "error" without articulating a *Bruton* claim. Faulkner also claimed in the motion for new trial that error occurred when the prosecutor read from his statement during closing argument. He has not advanced this issue on appeal.

-11-

With respect to Chris Hurt, we are at a loss to understand what actions of the prosecutor aggrieved the defendant. As noted above, the defendant's brief and reply brief are devoid of any citation to any portion of the record in which the alleged error occurred. For this reason alone, the issue is waived. *See* Tenn. R. Ct. Crim. App. 10(b). Moreover, upon our review of the record, we did not discover any situation in which "the trial court allowed the state's attorney general to read extensively from a statement from a codefendant not on trial with [Faulkner], during his case in chief[,] cross examination, and rebuttal" as alleged by the defendant.

The defendant's second *Bruton* issue relates to Investigator Hutchison's testimony. The defendant claims that it was error for the court to allow Hutchison "to read directly from one of the co-defendant's statements." The defendant does not identify which co-defendant's statement he finds objectionable, even though Hutchison quoted both Ted Ogle's and Terry Ogle's statements in the portions of the record cited in the defendant's brief. By his ambiguous presentation of the issue, the defendant has come perilously close to waiving our consideration of the issue. We will endeavor, however, to address the issue relative to both Ted and Terry Ogle's statements admitted via Investigator Hutchison.

Ted Ogle's statement, as quoted by Hutchison, was inculpatory only of Ted Ogle. No mention was made of Faulkner. Likewise, the statement that Hutchison attributed to Terry Ogle inculpated Terry Ogle but was silent as to Faulkner.[10] The trial court instructed the jury to consider an individual statement only against the defendant who gave it.

The admission of a co-defendant's statement which is not inculpatory of the complaining defendant does not raise *Bruton* concerns. *State v. Person*, 781 S.W.2d 868, 872 (Tenn. Crim. App. 1989); *see State v. Aaron A. Winters*, No. 02C01-9802-CR-00053, slip op. at 23 (Tenn. Crim. App., Jackson, Aug. 19, 1999), *perm. app. denied* (Tenn. 2000). As such, the defendant's claim must fail.

Faulkner's next claim of *Bruton* error is that the state's rebuttal witness read "significant portions" of the defendant's statement for no purpose other than to refresh the jury's memory just prior to deliberations. The defendant claims, "Because nothing new was added with this testimony, and the witness was only reading the appellant's statement, the defendant was unable to properly cross-examine the witness. Therefore, the appellant's right to confrontation was violated and the trial court committed reversible error." We fail to understand the significance, in *Bruton* terms, of the witness having read portions of Faulkner's statement during his testimony. *Bruton* addresses confrontation concerns of a non-testifying co-defendant. In the situation here, the

---

[10]We acknowledge that the prosecutor asked Hutchison what Ogle said that Chris Hurt would give "them" to kill Judy Hurt. Hutchison responded that Ogle said, "Chris said she would give *me* fifty dollars plus anything *I* wanted from the house to kill her." (Emphasis added.) Also, on cross-examination, counsel for Terry Ogle inquired whether Ted and Terry Ogle's statements both said "*[W]e* took the truck. . . . So it wasn't just Terry saying I took the truck, they both said we took the truck?" (Emphasis added.) We do not view these questions and responses as inculpating the defendant Faulkner.

-12-

statement read was that of the defendant himself, who could and did take the stand. A *Bruton* inquiry is inapposite, and we see no merit in this claim of error.

Finally, Faulkner claims *Bruton* was violated when the attorney general referred to and read portions of the statement of an unidentified co-defendant in his rebuttal argument. As with the first and second *Bruton* issues, Faulkner's brief is deficient in identifying which individual's statement is the focus of his complaint. In the portion of the record cited in the defendant's brief relative to this issue, the prosecutor refers to the statements of co-defendants Ted and Terry Ogle.

In any event, we fail to see how the prosecutor's argument about Ted and Terry Ogle's statements amounts to a *Bruton* error. The defendant claims, "Because the appellant could not confront this statement or cross-examine the witness who gave the statement, the appellant's right to confrontation was violated and the trial court committed reversible error." We have already said that the admission of portions of Ted and Terry Ogle's statements did not violate *Bruton* because they were not inculpatory of the defendant. If the evidence itself did not violate *Bruton*, the prosecutor's closing argument based upon it could not, either.

In sum, we see no *Bruton* error in any of the complained-of matters.

## VI

The defendant also argues that the trial court should have severed his case from that of his Ogle co-defendants. He claims that based upon *Bruton* concerns, he should have received a separate trial. However, we have just outlined in section V above that there was no *Bruton* error. Thus, any severance claim based upon *Bruton* concerns must fail.

## VII

Next, Faulkner urges that the trial court erred in failing to submit supplemental jury instructions to the jury in writing. During deliberations, the jury submitted the following written question to the court, "If you do not know how many people are in the house, does premeditation apply to the ones you do not know about." One of the jurors then orally clarified the question, "Do they have to know how many people are there in order to have . . . premeditation towards all the people in the house?" The court gave the following oral instruction

> No, sir. No. If you know, if the proof is if there is a person there that you intend to commit an act upon and you engage in certain conduct that affects other people, then you, if you have the premeditation as to one person under certain facts and circumstances, and you engage in a course of conduct with that same premeditation, then that would apply to the others as well.

-13-

The court did not reduce this supplemental instruction to writing to be submitted to the jury. Counsel for the defendant Faulkner objected to the content of the instruction, although he did not object on the basis that a written instruction should have been submitted.[11]

As the defendant correctly asserts, the trial court must reduce every word of the charge relative to felony offenses to writing, read the written charge to the jury, and give the written form to the jury to be in its possession during deliberations. Tenn. R. Crim. P. 30(c). The question in this case is whether the court's supplemental instruction fell within the ambit of Rule 30(c).

This court has said that a supplemental instruction which is merely for clarification purposes is not governed by the writing requirement of Rule 30(c). *See State v. Tywan Faulk*, No. M1999-01124-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Nashville, Aug. 31, 2000), *perm. app. dismissed* (Tenn. 2000). However, we have also said otherwise. *See State v. Crocker*, 697 S.W.2d 362, 365 (Tenn. Crim. App. 1985).

In the context of this case, it is unnecessary for us to decide which is the correct position. Even if the failure to submit a supplemental instruction in writing is error, it is cause for reversal only if it more probably than not affected the judgment. Tenn. R. App. P. 36(b); *State v. Gorman*, 628 S.W.2d 739, 740 (Tenn. 1982); *see State v. Jason Thomas Beeler*, No. W1999-01417-CCA-R3-CD, slip op. at 36 (Tenn. Crim. App., Jackson, Nov. 2, 2000). In the context of evaluating whether an erroneous charge has been harmful, our supreme court has prescribed review of the entire charge to determine whether the error was prejudicial. *Gorman v. Earhart*, 876 S.W.2d 832, 836 (Tenn. 1994).

The defendant in the case at bar has failed to articulate beyond bare conjecture that any prejudice befell him as a result of the trial court's action. Upon review of the entire charge, we are unconvinced that the court's failure to submit the supplemental instruction in written form more probably than not affected the judgment to the defendant's detriment.

**VIII**

In his penultimate issue, the defendant claims that the trial judge erred in informing the jury of the time at which he would end deliberations for the evening. The defendant argues that this "rushed the verdict since the jurors apparently did not want to spend another night in sequestration."

The jury retired for deliberations at 3:17 p.m. on the third day of trial. At 7:05 p.m., the jury returned to the courtroom, and the court inquired as follows

Ladies and gentlemen, it is 7:05. You all have been out – what time did they go out? Roughly 3:15 so you all have been working long and hard and certainly the

---

[11]The defendant did raise this issue in his motion for new trial.

Court isn't trying to rush you because these are serious matters and I want you all to take all the time that is necessary for you. However, I feel like I am also under some constraints in the sense that I'm not going to let you all work late into the night. So you can sort of plan and have some idea. Probably about 9:00 I will probably send you all back to the motel and on to dinner.

So how do you all feel about dinner right now? Do you all want to go to dinner . . . or stay and work?

A juror responded that the jury's preference would be to stay and continue deliberations. The court then advised the jury to notify him if they wanted something to eat and offered the possibility of bringing pizzas to them. The jury retired at 7:17 p.m., and it returned with its verdict at 8:12 p.m.

The defendant has articulated no factual basis for his assertion that the jury was "obviously in a rush to reach a verdict," and the record reveals none. The court said nothing which *required* the jury to render its verdict by 9:00 p.m., and we see nothing of record which was anything more than inquiry into and discussion of matters of scheduling. Also, the jury returned with its verdict at 8:12 p.m.; any claim that the jury was rushed into rendering a verdict is belied by the fact that it accomplished its task well before the appointed "quitting time" of 9:00 p.m.

The defendant has failed to carry his appellate burden with respect to this issue.

**IX**

Finally, Faulkner claims he received an excessive sentence. The trial court imposed Range I, 23-year sentences for each of the attempted first degree murder convictions and a Range I, four-year sentence for the theft conviction. The court ordered that three of the four attempted first degree murder sentences be served consecutively and that the theft conviction be served consecutively, for an effective 73-year sentence.[12]

When there is a challenge to the length, range or manner of service of a sentence, it is the duty of this Court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id*. If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the

---

[12]The defendant argues in his brief and reply brief that the trial court's sentence of "seventy-two years" was excessive. The record reflects, however, that the effective sentence was 73 years.

record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In this sentencing challenge, the defendant argues only the trial court failed to consider several mitigating factors. Mitigating factors are relevant to the length of individual sentences. *See* Tenn. Code Ann. § 40-35-210(d), (e) (Supp. 2000).

The mitigating factors in question are

(3)     Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

(4)     The defendant played a minor role in the commission of the offense;
. . .

(6)     The defendant, because of youth or old age, lacked substantial judgment in committing the offense;
. . .

(8)     The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; however, the voluntary use of intoxicants does not fall within the purview of this factor;
. . .

(11)    The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct;

(12)    The defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime[.]

Tenn. Code Ann. § 40-35-113(3), (4), (6), (8), (11), (12) (1997).

The sentencing court made findings that certain enhancement factors existed and that the defendant's age was "some consideration" in mitigation. The court did not specifically address why it rejected the mitigating factors listed above. However, it made extensive factual findings which signify its rejection of factors (3), (4), (6), (11) and (12). For example, the court was extremely compelled by the "brutality" and "free wheeling, unmitigating acts of violence, random acts of violence" inherent in the defendant's crimes. The court also found that the defendant was a leader in the offense and that he had no hesitation in committing violent acts. The court commented that the only reason that the defendant had not compiled an extensive criminal record was due to his young age and said, "That someone would just be so willing at the drop of a hat to blow your brains out over nothing is scary." Clearly, the court's findings support its rejection of all mitigating factors other than factor (8).

In support of factor (8), mental or physical condition that significantly reduced culpability for the offense, it appears that the defendant intended to offer a psychiatric report of

-16-

Russell D. McKnight, M.D.[13] The only report of Dr. McKnight in the appellate record, however, pertains to an individual named Randy Bowlin, who appears to be another client of the defendant Faulkner's attorney.[14] Nothing in Dr. McKnight's report relative to Randy Bowlin has any bearing on the defendant Faulkner's mental or physical condition.[15] As such, the trial court committed no error in declining to apply mitigating factor (8).

Thus, we conclude that the court did not err in declining to apply additional mitigating factors to the defendant's sentences. Having so concluded, the law requires that we affirm the sentence "even if we would have preferred a different result." *See Fletcher*, 805 S.W.2d at 789.

The defendant also summarily raises the issue of consecutive sentencing by arguing that he should "receive a sentence commensurate with one attempted first degree murder as opposed to four." He fails to address why consecutive sentencing is inappropriate under section 40-35-115(b), and he fails to cite any authority to support his position. This issue is waived. *See* Tenn. R. Ct. Crim. App. 10(b).

Even if we were to overlook this waiver, we would not disturb the sentence imposed by the trial court. The trial court found that the defendant was a dangerous offender and was thereby qualified for consecutive sentencing. *See* Tenn. Code Ann. § 40-35-115(b)(4) (1997). Upon our *de novo* review, we agree that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." *Id.* Likewise, the record amply demonstrates that an extended sentence reasonably relates to the severity of the defendant's offenses, and that it is necessary to protect the public from further criminal conduct of the defendant. *See State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In conclusion, we are unpersuaded of error in the proceedings below and therefore affirm the judgment of the trial court.

---

[13]To the extent that the defendant may have been relying on trial evidence that he was intoxicated at the time of the offense, factor (8) specifically excludes mitigation on this basis. *See* Tenn. Code Ann. § 40-35-113(8) (1997).

[14]We have considered whether the report may pertain to the defendant Faulkner but merely misidentifies him. However, it is apparent that the patient was not misidentified. The report recites that Mr. Bowlin was charged in connection with the shooting of his stepfather.

[15]Even if the trial court received a psychiatric report from Dr. McKnight relative to the defendant Faulkner, it was not included in the record on appeal. The defendant, as the appellant, bears the primary responsibility for ensuring accurate preparation of the appellate record. Tenn. R. App. P.24(a), (b); State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993). To the extent that the appellate record is deficient in fully reflecting what transpired in the lower court relative to an issue, we are unable to review that issue. *State v. Thomas Dee Huskey v. The Knoxville News-Sentinel*, No. 03C01-9811-CR-00410, slip op. at 5 (Tenn. Crim. App., Knoxville, Feb. 12, 1999) (order on petition for rehearing) ("The appellant cannot show error if it fails to show what transpired [in the lower court]."), *perm. app. denied* (Tenn. 1999).

_____

JAMES CURWOOD WITT, JR., JUDGE