**Dennis Gregory GORMAN, Administrator of the Estate of Sue Hall Hamilton, and J.C. Hamilton, Surviving Spouse of Sue Hall Hamilton, Plaintiffs–Appellants,**

v.

**Everett J. EARHART, Defendant–Appellee.**

Supreme Court of Tennessee, at Jackson.

April 25, 1994.

C.J. Gideon, Jr., Bryan Essary, Nashville, for plaintiffs-appellants.

Richard L. Dunlap, III, Fred N. McLean, Paris, for defendant-appellee.

## OPINION

REID, Chief Justice.

This case presents for review the decision of the Court of Appeals, reversing a judgment for the wrongful death of the plaintiffs' decedent. The Court of Appeals found that the manual on Uniform Traffic Control Devices for Streets and Highways (1988) (hereafter referred to as "manual") was not applicable in this case. This Court reaches the same conclusion and affirms the decision of the Court of Appeals.

The record shows that the defendant, Everett Earhart, had purchased from a construction company and a private landowner

the timber on certain tracts of land located along the south side of U.S. Highway 79, a two-lane highway in Henry County. Defendant had finished cutting the timber purchased and was in the process of moving his machinery when the fatal accident giving rise to this suit occurred. The machinery included a Model 350–C John Deere crawler/loader, used to load logs onto trucks. The crawler is similar to a bulldozer, except that it is equipped with loading forks rather than a scrapper.

On October 19, 1990, defendant and Loy Humphrey drove to the site where the crawler was parked on the south side of Highway 79 for the purpose of loading the machine onto the defendant's trailer, which was parked on the north side of the highway directly across from the crawler, and transporting it to another location. The intended path across the highway to the trailer was just below the crest of a hill, out of view of traffic approaching from the east. Humphrey's function was to flag traffic while the defendant drove the equipment across the highway. Humphrey obtained a red warning flag and, according to a police officer who investigated the accident, stationed himself approximately 103 ft. to the east of where the collision occurred.

Humphrey gave the defendant an all clear signal, and the defendant began driving the crawler across the highway. The maximum speed of the crawler was approximately 2 miles per hour. After the crawler had started across the travelled portion of the highway, Humphrey noticed a vehicle approaching from the east. Humphrey testified that he was standing in the middle of the highway and tried to warn the approaching vehicle of the crawler's presence by waving his flag. The vehicle was being driven by the decedent, Sue Hamilton, who, according to Humphrey, did not slow down and nearly struck him as she drove past. When the crawler was approximately half-way across the highway, Hamilton's vehicle collided with the forks on the front of the crawler. Hamilton was killed instantly.

Humphrey wore no safety vest. No signs were in place to slow oncoming traffic or to warn of the presence of a flagger. The speed limit along the area of highway where the collision occurred was 55 miles per hour. Witnesses estimated Hamilton's speed just prior to the collision at 40 to 60 miles per hour.

On March 27, 1991, Dennis Gregory Gorman, as the administrator of Hamilton's estate, filed suit against the defendant seeking damages for his mother's death. The complaint alleges that driving the crawler from one side of the highway to the other under the crest of the hill where it could not be seen by oncoming traffic was negligence. The defendant denied the allegations of negligence and alleged that he had placed a flagger on the highway to warn motorists such as Hamilton to stop; that Hamilton should have seen the flagger; and that Hamilton was guilty of contributory negligence. The defendant also counterclaimed for the damage done to his crawler.

The case was tried in November, 1991. The jury was charged in pertinent part:

> I charge you, Ladies and Gentlemen, that at the time of the collision giving rise to this case, the Manual of Uniform Traffic Control Devices was in full force and effect in the State of Tennessee. That manual requires that flagger stations, where a flagger is being used, be located far enough in advance of the work site to give approaching traffic sufficient distance to reduce speed before entering the work site project. It further requires the flagger to use orange clothing, such as a vest, shirt, or jacket.

Defendant objected to this instruction and asserted that the standards set out in the manual applied only to governmental entities or individuals operating under contract with government entities, and did not apply to defendant, a private individual with no relationship to any government agency.[1]

The jury returned a verdict in favor of Hamilton's estate in the amount of $78,000.

---

1. The manual referenced in the charge was adopted by the Tennessee Department of Transportation pursuant to the authority granted to it by T.C.A. § 54–5–108. *See Rules of Tennessee Department of Transportation,* Tenn.Comp.R. & Regs. tit. XIV, ch. 1680–3–1–.06 (1990); *see generally, O'Guin v. Corbin,* 777 S.W.2d 697, 699 (Tenn.App.1989).

The Court of Appeals found the "legislature did not intend for the manual to be applicable to the situation at issue...." Specifically, the Court found that the charge pertaining to the manual was error because the defendant did not have a contractual relationship with a governmental entity and because the provisions of the manual would not otherwise apply to him as a private person. The Court also found that the instruction more probably than not influenced the jury's verdict, and, therefore, reversed the trial court judgment and remanded the case for a new trial.

The record shows that the defendant did not comply with the provisions of the manual, particularly those relating to flaggers. Where applicable, the manual requires that flaggers be located far enough in advance of the work site so that approaching traffic will have sufficient opportunity to slow down before entering the work site. Manual on Uniform Traffic Control Devices, § 6F–5 (1988) (stating that "200 to 300 feet is desirable"). According to the investigating police officer, Humphrey was stationed 103 feet from the collision site. The manual also provides that the "use of orange clothing such as a vest, shirt, or jacket shall be required for flaggers." Manual at § 6F–3. Humphrey was not wearing an orange vest, and it does not appear in the record that he had on any orange clothing. Defendant and Humphrey testified that, not only were they unaware of the requirements and standards set forth in the manual, but that they had never heard of such a manual. The critical question, therefore, is whether the provisions of the manual are applicable to this case.

For purposes of this case, the key provision of the manual is Part VI, Section 6A–4, which provides in part:

### Part VI.
### TRAFFIC CONTROLS FOR STREET AND HIGHWAY
### CONSTRUCTION, MAINTENANCE, UTILITY AND
### EMERGENCY OPERATIONS
A. INTRODUCTION AND GENERAL SPECIFICATIONS
6A–4 Responsibility
The responsibility for the design, placement, operation, and maintenance of traffic control devices rests with the governmental body or official having jurisdiction. Therefore, traffic control devices shall be maintained and shall not be removed or altered in any way without the authorization of the governmental body or official having jurisdiction. The provisions for public, pedestrian and worker protection established herein are for application by (1) State highway department, county, and municipal forces performing construction or maintenance operations on roads and streets, (2) contractors employed in road or street construction or maintenance under contract to any governmental authority, and (3) all others, including employees of public utility companies, fire departments and enforcement officials, performing any operations on highways or so closely adjacent as to create hazards for the public or for themselves.

These standards, as a part of the Manual on Uniform Traffic Control Devices, should be adopted by all public authorities concerned with highways, and should be given effect by official instructions to employees and by incorporation into the specifications for all contracts.

Manual at § 6A–4.

Subsection 1 of § 6A–4 does not apply to this case because a governmental entity was in no way involved in moving the defendant's crawler across the highway. The manual likewise is not made applicable by way of subsection 2 of § 6A–4 because the defendant did not have a contractual relationship with a governmental entity to undertake construction or maintenance on the highway. Nor does this case fall within the "all others" provision of subsection 3 of § 6A–4 because this language, viewed in the context of § 6A–4 and the manual as a whole, was not intended to encompass private persons such as the defendant who have no relation whatever with a governmental agency and who are in

no way involved with construction or maintenance work on a public road or highway. By its own terms, subsection 3 contemplates encompassing "all others ... *performing any operations on highways....*" (Emphasis added). Moreover, § 6A–4 specifically provides that "[t]hese standards, as a part of the Manual on Uniform Traffic Control Devices, should be adopted by all *public authorities* concerned with highways, and should be given effect by *official instructions to employees and by incorporation into the specifications for all contracts.*" (Emphasis added). This section goes on to emphasize that "*authorities having jurisdiction* be able to require proper protection, that responsibility be clearly assigned, adequate training of personnel be provided, and that there be adherence to the standards and provisions of this manual." (Emphasis added). Manual at § 6A–4. Furthermore, under Part I of the "General Provisions" portion of the manual, the manual states that "[t]he responsibility for the design, placement, operation and maintenance of traffic control devices rests with the *governmental body or official having jurisdiction.*" (Emphasis added). Manual at § 1A–3. The portion of the manual applicable specifically to flaggers states that "[t]he control of traffic through work areas is an essential part of *highway construction and maintenance operations. For these operations* there must be adequate legislative authority for the implementation and enforcement of needed traffic regulations, parking controls and speed zoning." (Emphasis added). Manual at § 6F–1.

■ Based upon the foregoing, the Court holds that the standards set forth in the manual apply only to public authorities engaged in or concerned with construction, operation, or maintenance work on public roads and highways and those persons or other legal entities having a contractual relationship with public authorities. The manual does not apply to private individuals not engaged in construction or maintenance work on that road or highway. Therefore, it is not applicable to this case.

It should be noted that all of the cases in which Tennessee courts have dealt with the manual involved a party who was either a governmental body or a private individual who had a contractual relationship with a governmental body, or a governmental official having jurisdiction. *See, e.g., Johnson v. Oman Construction Co., Inc.,* 519 S.W.2d 782 (Tenn.1975); *O'Guin v. Corbin,* 777 S.W.2d 697 (Tenn.App.1989); *Swafford v. City of Chattanooga,* 743 S.W.2d 174 (Tenn.App. 1987); *Davis v. City of Cleveland,* 709 S.W.2d 613 (Tenn.App.1986).

■ Plaintiffs assert that even if the defendant initially had no duty to comply with the manual, the standards set forth in the manual became applicable upon his election to use a flagger. They rely upon the principle that one who begins to undertake a course of action, without any legal obligation to do so, assumes a duty to act with reasonable care. *See Nidiffer v. Clinchfield, R. Co.,* 600 S.W.2d 242, 246 (Tenn.App.1980) ("It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."); *Prosser and Keeton on Torts,* § 56 at 378–80 (5th ed. 1984) (same). The obligation to exercise reasonable care does not, *ipso facto,* make one subject to regulatory or statutory standards that were not designed or intended to apply. Thus, while defendant's decision to utilize a flagger invoked a duty to exercise reasonable care in that regard, it did not subject the defendant to the provisions of the manual.

■ Having decided that the standards set forth in the manual are inapplicable to this case, it is necessary to decide whether the erroneous charge, that the standards were applicable, more probably than not affected the judgment of the jury. *See* Tenn. R.App.P. 36(b) ("A final judgment ... shall not be set aside unless, considering the whole record, error ... more probably than not affected the judgment...."). In reviewing the erroneous charge, it is appropriate to consider the charge as a whole in determining whether prejudicial error has been committed. *Abbott v. American Honda Motor Co., Inc.,* 682 S.W.2d 206, 209 (Tenn.App. 1984). The specific instruction at issue must be considered in light of its context. *Carman v. Huff,* 32 Tenn.App. 687, 227 S.W.2d 780, 786 (1949). There is no reversible error

if the erroneous charge was explained or corrected in other parts of the charge so that the jury would not be mislead. *In re Estate of Elam*, 738 S.W.2d 169, 174 (Tenn.1987); *Smith v. Parker*, 213 Tenn. 147, 373 S.W.2d 205, 209 (1963).

Viewing the record as a whole, the erroneous charge that the standards of the manual governed the defendant's conduct more probably than not affected the verdict. As conceded by Hamilton's estate, the decisive issue before the jury was whether Hamilton had sufficient time in which to see Humphrey, the flagger, and understand his intentions, and then sufficient time to react accordingly. Thus, the proof at trial focused on whether Humphrey was stationed at a place where he could safely warn approaching traffic of the dangers created by the slow-moving crawler, and whether that location provided users of the highway an opportunity to perceive the danger and take appropriate action. The manual permeated the entire trial. It was referred to repeatedly in the presence of the jury, in both argument and in eliciting testimony. The trial court instructed the jury that the defendant was required to comply with the provisions of the manual, regarding the use of flaggers, their duties, and their safety clothing. This charge was given on the heels of the defendant's admission, and that of his flagger, that they were not even aware of the manual's existence, much less its specific provisions. Given the nature of the issue and the proof presented to the jury, the trial court's charge more likely than not influenced the jury to evaluate the defendant's actions by the standards in the manual, instead of common law principles of ordinary and reasonable care. The judgment of the trial court therefore must be reversed.

The judgment of the Court of Appeals allowing discretionary costs for transcribing certain depositions and the expenses of photocopying, postage, telephone calls, travel, and Westlaw research is affirmed.[2] *See Locke v. National Union Fire Ins. Co.*, 809 S.W.2d 483, 489–90 (Tenn.1991).

Accordingly, the Court of Appeals is affirmed, and the case remanded for a new trial. Costs shall be taxed to appellants.

2. Note that the revised version of Rule 54 of the Tennessee Rules of Civil Procedure did not become effective until July 1, 1993; and consequently, was not applied in this case.

DROWOTA, O'BRIEN and ANDERSON, JJ., concur.

DAUGHTREY, J., not participating.