IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 20, 2006 Session

## STATE OF TENNESSEE v. JOHN WILLIAM MATKIN, III

**Appeal from the Circuit Court for Sevier County**
**No. 10557     Rex Henry Ogle, Judge**

_____

**No. E2005-02946-CCA-R3-CD - Filed November 19, 2007**

_____

The defendant, John William Matkin, III, was convicted by a Sevier County Circuit Court jury of voluntary manslaughter, a Class C felony, and was sentenced as a Range I, standard offender to serve six years in the Department of Correction. In this appeal, he claims that the evidence is insufficient to sustain the conviction, that the trial court committed reversible error with respect to the jury instructions, and that he was improperly sentenced. Upon review, we hold that the defendant is not entitled to relief and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Edward C. Miller, District Public Defender, for the appellant, John William Matkin, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; James B. (Jimmy) Dunn, District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case involves the defendant's killing his step-father, William Harold Zelm. The defendant had been living in the home the victim shared with his wife, who is the defendant's mother. There was undisputed evidence that the victim wanted the adult, unemployed defendant, who was separated from his wife, to move out of the home. The state presented the theory that the defendant committed an unprovoked and unjustified killing of the victim. The defendant admitted his responsibility for the victim's death but claimed he acted in self-defense after the victim attacked him.

William Ivy testified that he was employed as a 9-1-1 dispatcher in March 2004. He testified that he received a 9-1-1 call regarding a drowning in Wears Valley and that he dispatched various responders to the scene.

John Timmerman, an emergency medical technician with the Sevier County Ambulance Service, testified that he and his partner responded to the victim's residence on March 5, 2004. He was met by the defendant, who told him that the victim had fallen into a small fish pond. Timmerman said he went down a hill to the pond and found the victim's body, which was out of the pond. Timmerman and his partner attempted to revive the victim, but they were not successful. Timmerman saw a laceration on the back of the victim's head. He said that rocks around the pond were wet and appeared to have been washed. Timmerman said that he saw scratches on the defendant's knees and head and that the defendant said he had fallen coming up a hill. Timmerman said the defendant did not complain of an ankle injury.

Sevier County Deputy Sheriff Randy Thomas testified that he was dispatched to the scene. He said that responders from the fire department and ambulance service were already on the scene when he arrived and were working on the victim near the pool. Deputy Thomas noticed the defendant's injuries, which consisted of a small cut on his forehead and scratches in six separate locations of his body. The defendant was wearing shorts but no shirt. Deputy Thomas said the defendant told him that he had last seen the victim about 9:15 a.m. He said the defendant claimed to have stepped onto the back deck about 10:00 a.m. to check on the victim and saw the victim face down in the fish pond.

Deputy Thomas recounted that he had responded to dispatches to the residence twice on February 9, 2004. The first time, the victim met him and said there was a substance he wanted to have checked. The substance turned out to be smoking tobacco. Thomas said the victim was not upset or agitated. He testified, however, that the victim asked him to look around the house to see if he saw anything in plain view that was drug related. Thomas did so, but he did not see anything. Deputy Thomas testified that he received a second dispatch later that day and that this time the victim told Thomas he wanted to get his stepson out of the house. Thomas said the victim "was a little bit disgruntled" but was not angry or cursing. Thomas said he discussed the matter with the victim and the victim's wife who disagreed with the victim and said she would like for her son to remain. Thomas testified that the victim was "even-tempered," although he said the victim said, "I guess I'll have to sell my house just to get him out of it." Thomas said he told the victim and his wife that the matter was civil in nature and that an eviction order might be required. Thomas testified the victim remained even-tempered throughout the encounter. On cross-examination, Deputy Thomas said he did not remember going downstairs in the home and talking to the defendant on February 9. He said he did not remember seeing that the defendant had his bags packed. He also denied any recollection of the victim going on a tirade for five or ten minutes and saying he would burn the house down and that he would take care of the situation himself. Deputy Thomas admitted he had requested an extra patrol on the residence as a result of the February 9 calls.

Investigator Jeff McCarter of the Sevier County Sheriff's Department testified that he responded to the scene. He did not have an opportunity to view the victim's body before the victim was removed. However, he examined the pool area, and he noticed a reddish stain on the rocks bordering the pond. He performed a preliminary test on the stain which was positive for blood. McCarter recalled that when he first arrived, the defendant was wearing shorts and no shirt. McCarter said that inside the house, he found leaves and debris in the bathtub and debris in the sink in the basement area where the defendant lived. He said he found the shorts which he had seen the defendant wearing that morning in the washing machine. McCarter said he photographed the defendant's injuries, which included scratches and abrasions on his head, back, shoulder, knee, outside his calf, and ankle. McCarter said the defendant told him that he got some of the injuries around the pond and rocks. McCarter also said the defendant reported that tree limbs might have scratched his back and face when he was going from the pond to the house to call 9-1-1. McCarter said, however, that he saw no tree limbs that could have hit the defendant as he had described.

Tennessee Bureau of Investigation Special Agent Charles Hardy testified that he was employed as a Forensic Scientist and that he analyzed fingernail clippings taken from the victim, which he compared with DNA samples from the defendant. He said that two distinct DNA patterns were present in the clippings. The victim was the major contributor of DNA from the clippings, and the minor contributor was the defendant. Hardy qualified his testimony on cross-examination by saying he "could not exclude" the defendant as the minor contributor.

Doctor Darinka Mileusnic-Polchan testified that she was a forensic pathologist and performed an autopsy of the victim. She testified that the cause of the victim's death was drowning and a contributing factor was blunt force trauma. She identified three areas of significant injury to the victim's body. She said the victim had a cluster of abrasions and bruises to the left forehead, indicating blunt head trauma. She testified the victim had a deep laceration to the left back of the head, also indicating blunt force trauma. She said the victim had a cluster of abrasions and bruises in the back left shoulder area. She identified the injury to the back of the head as one which would cause profuse bleeding, possible loss of consciousness, and possible death in the case of an elderly individual. Doctor Mileusnic-Polchan identified areas of lesser injuries, one of which consisted of bruising and abrasions to the victim's right hand. She said that it was not consistent with the victim striking someone with his fist but was more consistent with a defensive injury. The doctor also identified an area of abrasion and contusion to the victim's right shoulder. She said the shoulder injuries were consistent with the victim having struggled while someone was holding him down. She testified that the injury to the back of the head could be consistent with the victim having fallen and hit his head on a hard surface, but all of the injuries taken together were not consistent with that type of incident.

Doctor Mileusnic-Polchan testified that loss of consciousness due to drowning takes at least one-and-a-half minutes, and then brain death takes about three minutes. She said that the victim was in good health for his age.

Doctor Mileusnic-Polchan also testified about the defendant's injuries based upon her observations of the injuries in photographs. She said the defendant's forehead injury did not appear consistent with his having been hit with a fist. She also said abrasions on the side of his nose and his back were consistent with fingernail scratches. She also said the abrasions and bruises to the defendant's knees were consistent with contact with a hard surface, such as kneeling on a concrete floor or rocks. The witness testified she saw no photographic evidence of the defendant having been beaten with a fist.

Thais Zelm, the victim's wife and the defendant's mother, testified for the defense. She said that the defendant had lived with the victim and her in their Sevier County home for several months. She said the defendant had worked with the victim to help build parts of the home. Mrs. Zelm said the defendant gave her grocery money when he was working, although she said he had not been working at the time of the victim's death. She said that the atmosphere in the home was "okay" the first six months the defendant lived there but that it deteriorated during the last six months of the victim's life. She said the victim made statements that the defendant was "sorry" and that he wanted the defendant out of the house. She stated that when she came home from work, the victim would be in bed, would be non-communicative, or "would be stomping across the floor and slamming doors." She said that the victim believed the defendant was a financial drain on the household and that the victim made statements about losing the house and having the cable and electricity service terminated because of the defendant's living there.

Mrs. Zelm described various incidents which took place in early 2004. She said that one morning in January as she was getting ready for work, the victim began, for no apparent reason, using profanity and calling the defendant names. She said that she asked him to keep his voice down but that he disregarded her. She said the defendant apparently heard the victim because he came upstairs. She said the victim started toward the defendant, and the victim grabbed the defendant by his shirt and the victim pulled back his fist. She said she screamed for the victim to stop and for the defendant to go downstairs. She said the defendant turned away from the situation and went downstairs. Mrs. Zelm also testified that in January or February the victim took the defendant's computer out of the basement and put it in the garage to prevent the defendant from using it. She said that the victim cut the cable and telephone lines and closed the heat vents serving the basement during this time.

Mrs. Zelm testified that the victim had a daughter who attended college in Alabama. She said the victim wanted his daughter to move into the home and attend graduate school. She testified that after the victim's daughter told the victim in December 2003 that she was not going to do this, the victim took down pictures of his daughter.

Mrs. Zelm testified that the household tension had become so great by February that she talked to an attorney about obtaining a divorce from the victim. She said that the victim would not agree to an uncontested divorce and that because she did not have the money to pay for a divorce, she was unable to pursue one.

-4-

Mrs. Zelm testified that on February 9, the victim told her and the defendant that he had called a judge and that the defendant was going to be "locked up." She said the victim repeated his wish for the defendant to move out of the house. She said that an officer came to the house later and that she told him she did not want the defendant to move out of the house. She said that she told the officer the defendant was downstairs and that the officer went downstairs for approximately five minutes. She said the officer explained to the victim and her that the matter was a marital issue. She testified she told the officer and the victim that she wanted the defendant to remain in the house, which made the victim upset. The victim raised his voice and said he wanted the defendant out of the house. She said that the victim claimed he would burn the house down if the officer did not remove the defendant. Mrs. Zelm testified that after the officer left, she begged the defendant not to leave. She said the victim had threatened to burn the house on another occasion and had mentioned he would start the fire at the power box. She did not think the victim could accomplish this if the defendant were in the basement where the power box was located.

Mrs. Zelm testified that after this incident, the defendant stayed downstairs. She said she would take him a dinner tray when she cooked. She said she asked the defendant in March to begin reincorporating himself into the family by coming upstairs to eat, have coffee, and watch television. She testified she asked the defendant to offer to the victim his assistance with household tasks. She said the defendant had slowly been doing that.

Mrs. Zelm testified that on the morning of March 5, 2004, the victim was outside performing various tasks. She said she went outside to take the victim a cup of coffee and found him cleaning the fish pond. She said he was fussing because he had muddied his clothes. She said that he was becoming agitated and that she told him to go inside to get clean clothes and that she kissed him goodbye and left for work. Mrs. Zelm said the defendant called her at work later that morning and told her that the victim had an accident.

Mrs. Zelm testified that the victim took care of the household bills. She said she was unaware of the extent of their financial difficulties until after his death.

The defendant testified that he and his wife separated in 2003. He said that she wanted to move back to her hometown in Mississippi and that she took the family vehicle when she did so. At the time, they were living in Montgomery, Alabama. He said that the victim and his mother came to visit him and invited him to move into their residence and that he did so because he would have food, shelter, and transportation to work. He said that when he moved into the home his mother and the victim shared, the house was not finished and that he helped the victim do "finish work" on the house. He said he also worked outside the home, although he had not worked for several months before the victim's death. He said he had quit his last job when his boss had said something he did not like, and he had not been employed since then because he needed time to "chill out."

The defendant said he knew the victim and his mother were having financial difficulties because creditors called the house daily. He said he gave his mother money from his paycheck when

he was working. He said he had asked the victim to lend him $100 on one occasion, had repaid it, and had not asked any other times to borrow money.

The defendant testified about the January 2004 incident. He said that the victim had been downstairs that morning and that when he went back upstairs, he slammed the door so hard that it broke the door facing. The defendant heard the victim and his mother having an altercation about him, and he went upstairs and told the victim to bring any problems the victim had with him to him, not to his mother. He said the victim called him a profane name and moved to hit him. He said that he reached out and grabbed the victim and that his mother told the victim to stop and told the defendant to go downstairs.

The defendant also recounted the February 9 incident. He said that Officer Randy Thomas came downstairs and asked him about his problems with the victim. The defendant testified he showed Officer Thomas the broken door facing. He said that he showed Officer Thomas his living quarters and that Officer Thomas noticed a packed duffel bag. He said he told Officer Thomas he was leaving and asked if Officer Thomas knew of an inexpensive place he could rent. He said that Officer Thomas went back upstairs and that the victim raised his voice when talking with the officer. He testified he overheard the victim say that if Officer Thomas could not do anything with him, the victim would burn the house. The defendant also said he heard the victim say that he paid the bills and that if the defendant and his mother did not like the way he ran things, they could leave. The defendant stated that Officer Thomas told the victim that it seemed the victim was the only one in the house with a problem and that if he had to return, someone would go to jail. The defendant said that after Officer Thomas left, his mother came downstairs and tearfully asked him not to leave her alone with the victim.

The defendant testified that he stayed in his room after the February 9 incident until his mother asked him to relieve the stress in the family by coming upstairs to watch television, eat, and drink coffee with them. He said she also requested that he attempt to help the victim around the house.

The defendant testified that on the day of the victim's death, he went outside and asked the victim if he could help him. He said the victim called him a profane name and said he could pack his bags and leave the house. The defendant said he responded that the victim must have forgotten what Officer Thomas had said. The defendant said the victim attacked him. The defendant testified that the victim held him by his hair and that the defendant hit the victim with his elbow in an attempt to gain his freedom. The defendant said he fell on a hill and that as he attempted to get up, he saw the victim coming toward him using profanity and saying he would kill the defendant. He said the victim continued his attack, pulled him to the edge of the pond, and continued with the verbal threats to kill him. The defendant testified that the victim attempted to kick him and that the defendant grabbed the victim's feet or legs. The defendant said they went into the pond, with the defendant underneath the victim. The defendant said that he tried to come up for air and that he felt the victim's hand pushing him down. The defendant said that he was able to get a breath of air and that he pulled the victim close to him but did not know if he pulled the victim underwater. The defendant

testified that the victim quit struggling just as the defendant was running out of air. He said that when the victim stopped struggling, he was able to get up and go to the house to assess his injuries. He said that after he did so, he went outside to check on the victim and found him in the pond. He said that he tried to help the victim but that the victim was already dead, at which time he went inside and called 9-1-1.

The defendant admitted he initially had been untruthful in his 9-1-1 call and with the authorities. He claimed he did not want to implicate himself and he did not want to cause the victim's family additional stress while they were burying their family member. The defendant testified that he was afraid to come forward with the truth sooner because he felt like he was being set up for the crime. He said the authorities had been back inside the home without permission while he and his mother were at the hospital on the date of the victim's death. He also said that the victim's dentures had been moved from the pond area to the driveway and that after he and his mother returned home from the victim's funeral, his mother found the victim's eyeglasses in a location near the house where they would have been seen sooner had they been there previously. He said he eventually confessed to the crime after a detective threatened to arrest his mother, to take the case to the grand jury, and to charge him with first degree murder.

The defendant testified he acted in self-defense. He denied any intent to harm the victim when he went outside.

The defense recalled Mrs. Zelm, who testified that someone had been inside the home while she was gone to the funeral. She also identified from photographs the locations where the victim's glasses and dentures were found. She said she could see how the glasses might have been overlooked by the authorities, but not the dentures.

Glen Almany testified that he was an investigator with the public defender's office. He said that he attempted to contact Officer Thomas ten to twelve times to ask him some followup questions after an initial interview but that he was never able to make contact despite leaving numerous pager and voice mail messages for him. Mr. Almany said that he had interviewed Dr. Mileusnic-Polchan before trial and that she told him the bruising on the victim's left hand was consistent with the victim throwing punches. He said the doctor told him the victim had been in "remarkable condition for a . . . 72-year-old man." He testified the doctor also believed that the victim was not only capable of defending himself but of being an aggressor.

Officer Randy Thomas was recalled as a defense witness, and he introduced complaint cards that were generated as a result of the victim's calls to 9-1-1 on February 9. Officer Thomas said he placed an order for extra patrol of the area after these calls because he thought it was possible things could get out of hand. When asked on cross-examination about the victim's reputation for peacefulness in the community, Officer Thomas testified he had never had any problems with him.

On rebuttal, the state called the victim's daughter, Elizabeth Ann Zelm. She testified the victim was not upset with her over her decision to take a job elsewhere rather than to move to

Tennessee. She said the victim was happy at Christmas and was happy she had found a job. The witness testified the victim kept a briefcase of important papers and family jewelry behind the seat of his truck, which she had not seen since his death despite having searched for it. She said the victim told her that he wanted to sell his house and get something smaller. She also said the victim had stated that if his wife wanted to take care of the defendant, she should move out of the house and do so. Ms. Zelm denied noticing any change in the victim's temperament before his death.

Earl McCarter testified on rebuttal for the state that he had known the victim before his death. McCarter said the victim was a good, gentle person who did not bother others. He testified that during the last few months of the victim's life, he had not noticed any change in the victim's disposition.

Joel King, who had known the victim since the early 1970s when they began working together in Florida, testified that the victim "was a real people person." He said that the victim avoided conflict. Mr. King stated that he visited the victim two or three times a year after the victim moved to Sevier County. Mr. King said that he had observed the victim and the defendant together and that "they treated each other nicely." The witness said he never noticed a change in the victim before his death. Mr. King acknowledged on cross-examination that as an electrical engineer, the victim would have had the ability to cause an electrical house fire.

The jury found the defendant guilty of voluntary manslaughter. The trial court imposed a Range I, six-year sentence to be served consecutively to a prior two-year sentence the defendant had received for another offense.

# I

The defendant first contends that the verdict is not supported by the evidence. Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).

The defendant asserts that his testimony was the only evidence available to support a conviction. He argues that his testimony does not support a conclusion that he committed voluntary manslaughter because "his intentions were to save himself because he was in fear for his life." His

argument fails to take into account that the jury had the prerogative as the trier of fact to discredit his testimony in favor of other, circumstantial proof of his guilt.

The defendant was convicted of voluntary manslaughter, which is "an intentional or knowing killing of another in a state of passion produced by adequate provocation to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Based upon the evidence presented, the jury was within its province in rejecting the defendant's claim of self-defense and instead accrediting the evidence that demonstrated that the victim and the defendant engaged in a physical altercation which provoked the defendant to act irrationally in drowning the victim. There was physical evidence that the victim was held down on his back and struggled to get up, causing injuries to his shoulders, which was inconsistent with the defendant's testimony that he was underneath the victim in the pond and pulled the victim forward. The victim had injuries on his forehead which were consistent with having been pushed down against a hard surface, such as the hard bottom of a pond. The victim had a deep laceration on the back of his head, which is consistent with the victim having fallen and hit his head on a hard rock or concrete surface. The defendant attempted to conceal his level of culpability by being dishonest with the authorities. He told them he found the victim lying face down in the pond. The defendant did not tell the authorities about his injured ankle, despite the fact that the ankle injury was his explanation later for how the victim was able to overtake him after the victim allegedly attacked him and the defendant broke free. The defendant told the authorities he had scratches on his back from tree branches, yet other testimony and photographic evidence was inconsistent with the injuries occurring in this manner in the location the defendant claimed. Other evidence established that DNA which was not inconsistent with the defendant's was found under the victim's fingernails. There was evidence the defendant attempted to wash away blood from the rocks surrounding the pond. Even if the jury accredited the defendant's testimony that he pulled the victim into the water in self-defense, the defendant left the victim to die in the pond once the victim lost consciousness. There was evidence the injuries to the defendant's knees were consistent with kneeling on a hard surface such as a concrete floor or rocks. There was evidence that the injuries to the victim's hands were more consistent with defensive actions than with having hit the defendant. From this evidence, the jury could rationally conclude that the defendant intentionally or knowingly killed the victim after the victim adequately provoked the defendant to a state of passion, during which the defendant acted irrationally.

**II**

Next, we consider the defendant's related claims that the trial court erred when it did not reduce supplemental jury instructions to writing and that the defendant was prejudiced by the assistant district attorney general's statement that the supplemental instructions "were not the law." The state argues that the defendant waived any complaint by failing to object to the oral charge or to call to the court's attention at trial its omission in submitting written instructions to the jury, and in any event, any error was harmless. The state has not addressed the effect of the assistant district attorney's comment about the supplemental instructions.

The trial court is required to submit the jury instructions to the jury in writing. Tenn. R. Crim. P. 30(c). This rule applies to any supplemental instructions given, provided the supplemental instructions are for purposes other than merely clarifying the prior instructions. State v. Tywan Faulk, No. M1999-01124-CCA-R3-CD, Montgomery County (Tenn. Crim. App. Aug. 31, 2000), app. dismissed (Tenn. Dec. 4, 2000); cf. State v. Crocker, 697 S.W.2d 362, 365 (Tenn. Crim. App. 1985) (trial court's failure to give supplemental instructions to jury in writing was error, although the defendant waived any complaint by failing to object and instead consenting to court's action at trial). In any event, a defendant is entitled to appellate relief based upon failure to submit a supplemental instruction in writing only if the failure more probably than not affected the judgment. Tenn. R. App. P. 36(b); State v. Gorman, 628 S.W.2d 739, 740 (Tenn. 1982). In assessing harm, the court must review the error in the context of the charge in its entirety to determine whether the error was prejudicial. See, e.g., Gorman v. Earhart, 876 S.W.2d 832, 836 (Tenn. 1994).

In the present case, the jury returned to the courtroom after retiring for deliberations to make two inquiries. They asked first what would happen if they were unable to agree on a verdict, and the trial court advised them that it was not able to answer that question. Their second question, as stated by one of the jurors, was

> The – okay, the question I had, and I think that we all don't agree on, is some people believe . . .
> I don't know what the law is, but you don't even look at voluntary manslaughter until . . .
> Like, if you agree to both points on second degree murder, and the only difference between second degree murder and voluntary manslaughter is there was passion, there was – there was provoc[a]tion, there was . . .
> . . .
> Provocation.
> . . .
> Okay. Would you not look at both of them and say, *"I think there was provocation out there?"*

(First three ellipses in original) (italics in original).

The court attempted to answer the jury's inquiry in pertinent part as follows:

> As it relates to [deciding between second degree murder and voluntary manslaughter], in your analysis, in your discussions of any offense or lesser grades, certainly you all should look at everything. At everything. And, you know, if – if some of you want to discuss the – the issue of provocation, as to whether or not that is adequate provocation, certainly it would be discussed.

The court also instructed the jury that the verdict must be unanimous and should be the product of a deliberative process. A juror then refined the question, "I guess our question is: Do you consider the different types of charges at one time, or should you only consider second degree murder first, and then voluntary manslaughter, or can you consider both at the same time?"

Following this redefinition of the question, the trial court engaged in a lengthy statement addressing many topics, including credibility of the witnesses, weighing of evidence, and the burden of proof. Relevant to the jury's second question, the court instructed the jury in pertinent part

> All right, ladies and gentlemen, first of all, as I said, in – in order to find someone guilty of any offense, all of you have to agree to it. In your deliberations you may consider and should consider everything that has been charged to you on – on all things, evidence and everything else, and also the specific offenses. You know, if – if someone says – that they don't agree with this fact or that fact, I think you all can look to each other and talk about if it fits into any category, you know. If you are – if you are – if you are unable to reach a verdict on – on one included or lesser included offense, then if you think it would be helpful for you certainly to look at other offenses, that's what you should do.

Later in the colloquy, the court said

> Certainly look at the second degree murder first. If you're able to reach a verdict on that, report that verdict. If not, then consider voluntary manslaughter. If you can agree on a verdict there, . . . tell us. If you're unable to reach a verdict on that, go to the next one, and so forth, you know.

The court did not submit these or any other of its supplemental instructions to the jury in writing. The defense neither requested that the court do so nor objected to the supplemental charge given orally.

After the jury retired, the trial court admonished the assistant district attorney general for stating audibly, "That's not the law," while the court was giving the supplemental charge. The assistant district attorney general did not deny having made this statement, nor did he deny that the jury could have heard it. The defense did not register an objection, request a curative instruction, or move for a mistrial based upon the prosecutor's wayward remark. The defense did, however, raise the issue in the motion for new trial.

To the extent that the trial court may have erred by not submitting its supplemental instructions to the jury in writing, we hold that the defense waived any objection by not raising the issue at trial. Crocker, 697 S.W.2d at 365; see State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)

(holding that defendant waives right to object to incomplete, as opposed to erroneous, jury instructions if not raised at trial); State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996) (same); cf. State v. Page, 184 S.W.3d 223 (Tenn. 2006) (holding that there is no constitutional shortcoming in statutory waiver rule requiring request for instruction on lesser included offenses be made in writing at trial). Also, the defendant received the benefit of the supplemental instructions. It is apparent from the jury's questions that it was unsure how to proceed in choosing between second degree murder and voluntary manslaughter. After receiving the court's supplemental instructions, the jury convicted the defendant of the lesser of these two offenses, voluntary manslaughter. Thus, the defendant was not prejudiced by the supplemental oral charge.

The question which remains is whether the defendant was prejudiced by the assistant district attorney general's statement that a portion of the trial court's supplemental instructions was "not the law." The defendant first raised this issue in his motion for new trial, in which he asserted generally that he "was prejudiced and denied his right to a fair trial." He did not identify any specific prejudice in either the motion for new trial or the hearing on the motion. Similarly, he has not identified on appeal the specific prejudice which he alleges occurred as a result of the prosecutor's wayward comment. We conclude the defendant is not entitled to relief on these issues.

### III

The defendant argues that the six-year sentence he received was excessive. The sentencing range for the defendant, a Range I offender, was three to six years. See T.C.A. § 39-13-211(c) (defining voluntary manslaughter as a Class C felony offense); T.C.A. § 40-35-112(a)(3) (setting range of punishment for Class C felony offenses for Range I offenders at three to six years). The defendant does not contest the factual correctness of the two enhancement factors found by the trial court, that the defendant had a history of prior criminal convictions and that the defendant committed the offenses while on bail for an offense of which he was ultimately convicted. See T.C.A. § 40-35-114(1), (13)(A). He claims that it is not clear from the record whether the trial court found in favor of his proffered mitigation based upon having acted under strong provocation, the existence of substantial grounds to excuse or justify his conduct, and the commission of the offense under such unusual circumstances that it was unlikely the defendant was motivated by a sustained intent to violate the law. See T.C.A. § 40-35-113(2), (3), (11). He also claims, contrary to his argument at the sentencing hearing for a mid-range sentence, that his enhanced sentence violates Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004).

We start with the Blakely issue. In that regard, we note that one of the enhancement factors on which the trial court relied was the defendant's prior criminal record of convictions. The defendant did not contest at the hearing that evidence existed to support this factor. A trial court's consideration of this factor is unaffected by Blakely. See Blakely, 542 U.S. at 301 (any fact other than a prior conviction which enhances a defendant's sentence must be found by a jury beyond a reasonable doubt); Apprendi v. New Jersey, 530 U.S. at 489 (2000) (same). We note, as well, that the other factor relied upon by the trial court, that the defendant was on bond for another offense when he committed the present offense, is similar to enhancement for prior convictions insofar as

it is easily objectively determined. However, the Supreme Court did not except this category of sentence enhancement in Apprendi or Blakely, and we will endeavor to analyze the defendant's Blakely claim with respect to this enhancement factor.

We begin by considering whether the defendant waived the Blakely issue by failing to raise this challenge in the trial court. The defendant argues that he was sentenced in contravention of Blakely at his November 1, 2005 sentencing hearing because the trial court, rather than a jury, found the statutory enhancement factors. The federal courts have applied Apprendi and Blakely to all cases pending on direct review or not yet final. See United States v. Booker, 543 U.S. 220, 268 (2005). The problem for the defendant in this case is that both Apprendi and Blakely were decided before defendant's sentencing hearing took place. Thus, we hold that the defendant failed to preserve his Blakely challenge when he did not raise it in the trial court. At the time of his sentencing hearing, he had the benefit of the Supreme Court's ruling in Apprendi and its refining of that rule's parameters in Blakely.

We acknowledge that several months before the defendant's sentencing, the Tennessee Supreme Court had ruled, albeit incorrectly, that Tennessee's sentencing law as it existed before June 7, 2005, did not run afoul of the Sixth Amendment concerns addressed in Blakely. See State v. Gomez, 163 S.W.3d 632 (Tenn. 2005) ("Gomez I"), vacated and remanded by Gomez v. Tennessee, ___U.S. ___, 127 S. Ct. 1209 (2007). The version of the sentencing law addressed in Gomez was the one under which the defendant was sentenced. After the defendant's sentencing and after he filed his appellate brief in this court, the United States Supreme Court issued Cunningham v. California, ___ U.S. ___, 127 S. Ct. 856 (2007). The Supreme Court then granted certiorari in Gomez v. Tennessee, vacated the judgment, and remanded the case to the Tennessee Supreme Court with instructions to reconsider it in light of Cunningham. Recently, the Tennessee Supreme Court held that in light of the dictates of Cunningham, Tennessee's pre-2005 sentencing statute violated the Sixth Amendment. State v. Gomez, ___ S.W.2d ___ (Tenn. 2007) ("Gomez II").

Although the defendant in the present case might arguably have been misled at the time of his sentencing by the majority opinion of our supreme court in Gomez I, the United States Supreme Court, rather than the Tennessee Supreme Court, is the final arbiter of questions concerning the federal Constitution, and the defendant's Blakely claim should have been raised at his sentencing hearing, Gomez I notwithstanding. As such, our review is limited to whether the trial court committed plain error in sentencing the defendant. Gomez II, ___ S.W.3d at ___. Rule 52(b) of the Tennessee Rules of Criminal Procedure provides:

> (b) Plain Error. – When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

See also T.R.A.P. 36(b). Our supreme court has adopted the factors developed by this court to be considered

when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

In the present case, the transcript reflects that the trial court considered whether enhancement and mitigating factors applied and weighed them in arriving at a sentencing determination. It is likewise apparent that a clear and unequivocal rule of law was breached. See Gomez II, ___ S.W.3d at ___ (holding that application of enhancement factors other than fact of prior criminal convictions was breach of clear and unequivocal rule of law). It is also clear that a substantial right of the defendant was affected when he was denied his Sixth Amendment right to jury trial. See id. at ___. The record does not reflect waiver for tactical reasons. See id. at ___ (allowing plain error consideration where record did not reflect that defendant waived Blakely issue for tactical reasons). However, consideration of the issue is not necessary to do substantial justice. The trial court weighed both enhancement factors heavily, stating that the defendant's prior criminal convictions and his commission of the offense while on bond for another charge of which he was later convicted "greatly outweigh[ed] any mitigating factors." See id. at ___ ("That the trial court gave 'great weight' to the Defendants' prior criminal histories does not necessarily render irrelevant its application of enhancement factors (2) and (9) [applied in contravention of Blakely]."). The record reflects that the defendant has a lengthy prior criminal history. It likewise reflects that his counsel acknowledged at the sentencing hearing the accuracy of the prosecutor's statement that the defendant committed the present offense while on bond for a felony of which he was later convicted. Given that the defendant has numerous prior convictions and has conceded the accuracy of the facts used to enhance his sentence, consideration of the issue is not necessary to do substantial justice. Thus, the defendant has not established that he is entitled to plain error review.

Having determined that the defendant is not entitled to plain error relief on his Blakely claim, we consider the defendant's argument that the record does not reflect whether the trial court applied his proffered mitigating factors. Appellate review of sentencing is de novo on the record with a

-14-

presumption that the trial court's determinations are correct.[1]  T.C.A. § 40-35-401(d).  As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper.  This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment.  T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class B, C, D, or E felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. T.C.A. § 40-35-210(c).  Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors.  T.C.A. § 40-35-210(d), (e).  The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record.  T.C.A. § 40-35-210, Sentencing Commission Cmts.; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

---

[1] We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401.  See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8.  However, the amended code sections are inapplicable to the defendant's appeal.  The defendant was sentenced after the change in the sentencing laws took effect, but the record does not reflect that the defendant signed a waiver of his ex post facto protections to be sentenced under the amended provisions.  See T.C.A. § 40-35-210, Compiler's Notes.

The record reflects that the trial court considered the relevant facts and circumstances. With respect to the defendant's claim relative to mitigating factors, the record reflects that the court addressed and rejected each of the defendant's proffered mitigating factors. Moreover, the court stated that even if it gave the defendant the benefit of his proffered mitigating factors, any mitigating proof was so far outweighed by the enhancement factors that a maximum sentence was still appropriate. On appeal, the defendant has not shown the impropriety of a six-year sentence. As noted by the trial court, the defendant had a "substantial record" which consists of repeated driving and alcohol convictions. He committed the offense while he was on bail for one of these offenses. We hold that the trial court did not err in determining that even if it were to give the defendant the benefit of his proffered mitigating factors, the enhancement factors still outweighed those mitigating factors sufficiently to support a six-year sentence.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE