IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 1, 2021 Session

## OLD REPUBLIC LIFE INSURANCE COMPANY, ET AL. v. ROBERTA WOODY, ET AL.

**Appeal from the Circuit Court for McMinn County**
**No. 2013-CV-117      J. Michael Sharp, Judge**

_____

### No. E2019-01475-COA-R3-CV

_____

This appeal concerns a subrogation action.  Roberta Woody ("Woody") accidentally backed her tractor-trailer into one driven by Darrell King ("King").  King had an insurance policy through Old Republic Life Insurance Company ("Old Republic").  Old Republic, as King's subrogee, sued Woody and her employer, Osborn Transportation, Inc. ("Osborn") ("Defendants," collectively), in the Circuit Court for McMinn County ("the Trial Court"). King later joined as a plaintiff.  The Trial Court allowed Old Republic to participate at trial alongside King's counsel, but did not allow Old Republic to reveal its identity to the jury. After trial, the jury awarded King damages.  Old Republic appeals, arguing among other things that it should have been permitted to identify itself so as to make a case for its own unique and specific damages.  We hold, *inter alia*, that in this subrogation action, Old Republic could recover damages from Defendants only to the extent King could, and the Trial Court did not commit reversible error in preventing Old Republic from identifying itself to the jury.  We affirm the judgment of the Trial Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Sean W. Martin and Chancey R. Miller, Chattanooga, Tennessee, for the appellant, Old Republic Life Insurance Company.

William B. Hicky, Nashville, Tennessee, for the appellee, Darrell King.

John Thomas Feeney, Brentwood, Tennessee, for the appellees, Roberta Woody and Osborn Transportation, Inc.

## OPINION

## Background

On April 25, 2012, in McMinn County, Tennessee, Woody accidentally backed her tractor-trailer into a tractor-trailer driven by King. This accident sparked the present litigation, as King alleges he suffered an ankle injury. King was covered by Group Accident and Sickness Coverage and Truckers Occupational Accident Coverage insurance policies, which were provided through Old Republic. King's claims against Defendants were assigned to Old Republic. In April 2013, Old Republic, as King's subrogee, sued Defendants in the Trial Court seeking a judgment for the amount it paid King under its insurance policy. King filed a separate lawsuit in his home state of Georgia, which was dismissed for *forum non conveniens*.

In September 2015, King filed a motion to intervene in the McMinn County lawsuit. He later withdrew this motion. Old Republic moved to add King as an indispensable party. This motion was denied. In November 2015, King sued Defendants in Davidson County. Meanwhile, Old Republic continued to try to add King to its lawsuit as an indispensable party under Tenn. R. Civ. P. 19. Defendants filed a motion to dismiss the McMinn County lawsuit based on prior suit pending and real party in interest pursuant to Tenn. R. Civ. P. 17. In December 2015, the Trial Court denied Defendants' motion to dismiss and added King as an involuntary plaintiff.

King then filed a complaint in the McMinn County action. In February 2016, King filed a motion to dismiss the McMinn County lawsuit as an involuntary plaintiff, which Old Republic opposed. The Trial Court dismissed the case in its entirety on the basis of prior suit pending in light of the lawsuit in Davidson County. Old Republic appealed. In *Old Republic Life Ins. Co. v. Woody*, No. E2016-00844-COA-R3-CV, 2017 WL 1041591 (Tenn. Ct. App. Mar. 17, 2017), *no appl. perm. appeal filed*, we vacated the Trial Court's judgment and found that the Trial Court was indeed the proper forum. In December 2017, Defendants filed a motion for summary judgment seeking dismissal of the case for lack of medical proof, as well as a motion in limine to exclude proof at trial about causation and damages. The Trial Court found that Old Republic's request to present evidence of insurance benefits payments for medical expenses was inconsistent with subrogation. In other words, the Trial Court found that the mere fact Old Republic paid out pursuant to its insurance policy was insufficient proof of damages against Defendants. In September 2018, the case went to trial.

-2-

At a pretrial hearing, the parties and the Trial Court hashed out a number of issues, including whether the identity of Old Republic would be revealed to jurors. Defendants sought to prohibit Old Republic from identifying itself to the jury. The following exchange occurred:

THE COURT: All right. So are you saying though then that Mr. Martin [counsel for Old Republic] doesn't have the right to participate -- this is where I'm struggling. His client has already paid. So how is it proper that they should not have the right to participate?

MR. FEENEY [counsel for Defendants]: I've not said that they shouldn't have the right to participate, but they participate as Darrell King's lawyers. They don't walk in and say we're Old Republic and we paid this man a whole bunch of money and we're going to stand here and prove that -- because that puts a badge of some sort of amount and introduces dollars into this courtroom that aren't necessarily going to be there with Mr. King's proof. Now, pretrial, fully participate, take depositions, go get a doctor.

THE COURT: Which they've done.

MR. FEENEY: Which they've participated. They get to do all of that. Your Honor has already ruled that they stand in his shoes and I thought you had ruled that the measure of damages to be recovered in this case against my client is the measure of personal injury property damages in Tennessee, not the insurance benefit.

THE COURT: Okay.

MR. HICKY: And, Your Honor, as Darrell King's attorney, we don't have a problem with them being labeled as Mr. King's attorney as well. We don't. Because I mean, we essentially want the same thing for our clients in a sense of maximum recovery on that. And that would kind of go back to the jury form. If it just listed the different damages in there and didn't say Darrell King or Old Republic on there, which we'll get to that later on, but maybe a certain understanding that any award for medical damages that are filled out on that jury verdict form would go to Old Republic, you know, lost wages or things such as that.

MR. MARTIN: Your Honor, real quick. My concern with that is I'll be the one that gets shut out ultimately of that if I'm standing in the shoes. We both have ethical obligations to our client. I am not Darrell King's attorney. They are Darrell King's attorney. I have to assert Old Republic's rights and fight for them in the case. We have an ultimate equal goal that we want to maximize recovery from the jury in this case if one is going to be awarded. But outside of that, there's little nuances in there than are more important to my client and is not so concerned if Darrell King goes up there and talks about how bad it's ruined his life, though I know that helps the award. If I

-3-

can get the amounts in the number that we paid, that satisfies me and my client's obligation.

THE COURT: Right. But I don't see, Counsel, how doing it the way we've just discussed it in any way prejudices your clients. If we allow -- we've already allowed, obviously, to fully participate. You've been here more than you want to be here, I'm sure. But if we allow you to participate, Mr. Martin, from a perspective that counsel just laid out or Mr. Feeney laid out, with all respect, what does it matter to the jury? I mean, they don't have to know --

MR. MARTIN: So if they don't know I represent Old Republic and am seeking certain damages, I would want -- what I would further have to clarify to what extent can I argue for specific recovery for my client?

THE COURT: To the same extent -- and I'm not shutting you down. But to the same extent that counsel is going to argue to pain and suffering, to the fullest extent.

MR. MARTIN: And that's fine. One of Mr. Feeney's extensions of his order is that I can't participate in voir dire, opening, closing, cross examining witnesses. So if I can do all that and it's just that the jury doesn't know I'm Old Republic's lawyer, but it's just Darrell King, then yes, and I can have the freedom of anybody in the courtroom to do whatever I need to without breaching that wall, if you will, regarding insurance, then I think that probably is a workable solution.

THE COURT: Counsel?

MR. FEENEY: All the research I've done with regard to participation of more than one attorney in state court is -- comes down to discretionary matter with the Court.

THE COURT: Right. I was going to say, having gotten one back from the Court of Appeals that I got upheld on, it's just going to be up to the Court.

Folks, I want to say this. None of us here want to get this wrong because none of us here want to come back and do this one again, especially we're back now. So -- but at the same time in the sense of fairness, I have got to let this man, this client participate as I see it. So -- but I'm mindful of everybody's position. So here's where I'm at. I think that Mr. Martin can participate fully. I'm going to allow him to -- even though we know he is not co-counsel so much. He's separate counsel for Old Republic. You can't tell the jury that. Nobody can tell the jury that, but you can participate just as if y'all are a tag team, so to speak. I'm going to let you go through the voir dire. I'm going to let you go through the question and answer process.

Now, here's what I don't want. I do not want -- if you've already asked it, then please don't re-ask it. So you-all decide who is going to handle -- you know, if Mr. Hoffer is a witness, it would be much better, it would seem to me, for the jury -- and y'all know this. You're going to lose the jury

-4-

after a point. So you-all need to sort that out before you get here. I am going to allow you to participate. I think you can. I think that's the proper thing to do legally and I am going to allow you full field to do what you've got to do to represent your client, but you can't mention about the insurance benefits. We know what you're here for. We know what the verdict form is going to say as it relates to your client, but that's going to be between us. So do what you need to do to protect your client's interest, but please let's not re-ask the same thing. In fact, I'll stop you and say, Counsel, we've covered that, let's move on.

At trial, Defendants' counsel asked King certain questions concerning his criminal history on cross-examination. The Trial Court granted a mistrial as a result. In January 2019, the case was tried again. Old Republic was not allowed to reveal its identity to the jurors. Trial concerned damages only as Woody admitted fault.

King testified to his injuries. As relevant to the issues on appeal, King was asked on cross-examination about his actions in the aftermath of the accident:

Q. You climbed down out of the driver's seat into the parking lot and talked to Ms. Woody?
A. Yes.
Q. Told her you weren't injured?
A. I told her I think I was okay. I didn't say I wasn't injured. I said I think I'm okay.
Q. You waited for hours for the Tennessee Highway Patrol to show up?
A. Yes.
Q. Maybe four hours?
A. Yes.
Q. The Highway Patrol got there and asked you if you were hurt?
A. Yes.
Q. Your answer to the Highway Patrol officer was no?
A. I told him I thought I was okay. He asked me did I need an ambulance and I told him no.
Q. If you were hurt, you would have told him. You told him the truth, right?
A. Yes. But at that time I was running on adrenaline, so everything was just mile high at the time.
Q. But four hours later you didn't know your ankle was hurt?
A. I told her -- she asked me was I okay. I told her my ankle was hurting a little bit, but I didn't notice --
Q. At the Bowater facility, you're out in the -- on the other side of the guard shack. You walked up to the guard shack, back to your trailer --

-5-

A. Correct.
Q. -- several times?
A. Well, I went.  She went.  We both went.
Q. During that four-hour time?
A. Correct.
Q. Didn't go to the Bowater facility and ask for some ice for your ankle?
A. No, I didn't think about that.
Q. Didn't ask for any medical care from the Bowater facility medical staff?
A. I did not know they had a medical staff.
Q. Didn't ask for any medical --
A. They didn't offer medical assistance.
Q. Didn't go to a walk-in medical care in Cleveland on the day of the accident?
A. No.

King also was asked about whether he paid income taxes.  King stated he did not at the time of the accident.  King stated further that, even with the passage of seven years, he still had not paid his income taxes.  King testified he was working to clear up his tax problems.

Dr. John Chrabuszcz's video deposition was played.  Dr. Chrabuszcz, the orthopedic surgeon who treated King, stated in part:

Q. All right.  And who referred Darrell King to you?
A. Winston Jeshuran.
Q. Why did Dr. Jeshuran refer Darrell King to you?
A. Left ankle pain.
Q. And at this point in time, what did you do for Mr. King?
A. Physical exam and then we ordered an MRI.
Q. Okay.  Could you explain to the jury what a physical exam entails, please?
A. Evaluating the -- essentially in this case the body part that he was sent to me for, the ankle.  Evaluating any swelling, any problems with the integument skin, etc.  Evaluating neurologic status, vascular status, evaluating the musculoskeletal system, pain, range of motion, strength.
Q. Okay.  And can you tell how he was doing at this point in time in regards to his left ankle?
A. He had discomfort in the lateral aspect of the ankle, the outside of the ankle both in the sinus tarsi, which would be an area where you would think of ankle sprain, but more so along the posterior aspect where the tendons are, the peroneal tendons.
Q. Posterior meaning the outside of the ankle?

-6-

A. Posterior meaning back behind the lateral ankle bone, the outside ankle bone.

Q. And what was the issue at the posterior?

A. I was worried about an injury to the peroneal tendon and that's why we got the MRI.

Q. Okay. And did the MRI show an injury?

A. It showed some damage or at least inflammation, an injury to the peroneus longus tendon.

Q. And just explain to the jury what the peroneal longus tendon is.

A. There are two tendons in that area. Essentially, they do the opposite of what we consider an ankle sprain. Instead of being the ankle turning this way, they work to pull it out the other direction, so to speak, to protect you from that injury. And in an ankle sprain, you can injure those as well.

Q. Okay. Is it your opinion that that was what was injured in the wreck?

MR. FEENEY: Object to the form. Lack of foundation.

Q. Is that your opinion, Doctor?

A. Yes. He had no other source.

***

Q. All right. Then he is -- the last note you have for him is at what point?

A. Is that the 24th, I think, of 2013, 7/24 maybe.

Q. So a little over a year and two months; is that accurate?

A. Correct.

Q. And if his left ankle had not healed by that point, would you have expected it to heal without surgical intervention?

A. Probably not at that point.

Q. Okay. So is it your opinion that the only thing that could correct his left ankle would be surgery?

A. At this point, it was probably warranted to investigate surgically.

Q. Okay. And do you hold all the opinions you've expressed here to a reasonable degree of medical certainty?

A. Yes.

Dr. Chrabuszcz testified that, in his expert opinion to a reasonable degree of medical certainty, his treatment of King's ankle was necessary. Asked if his medical bills in relation to King's treatment were reasonable, Dr. Chrabuszcz stated: "I'm sure they were. I don't look at all the billings."

The jury returned a verdict of $18,506.44, broken down as follows: Medical Expenses-$1,253.72 (a figure encompassing only King's initial emergency room

treatment); Loss of Earning Capacity-$8,579.00; Property Damage-$8,673.72; Pain and Suffering-$0.00; and Loss of Enjoyment of Life-$0.00. Old Republic filed motions for a new trial, additur, discretionary costs, and pre-judgment interest. The Trial Court denied all of these motions except for an award of discretionary costs. Old Republic timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Old Republic raises the following issues on appeal: 1) whether the Trial Court erred by prohibiting Old Republic from presenting evidence of its "unique and specific damages" at trial; 2) whether the Trial Court erred in keeping Old Republic's identity from the jury; 3) whether the Trial Court erred by permitting Defendants to present evidence of King's nonpayment of income taxes at trial; and 4) whether the jury returned a verdict contrary to the weight of the evidence by ignoring uncontradicted proof of King's injuries and damages.[1]

Regarding our standard of review for cases decided by a jury, the Tennessee Supreme Court has instructed:

> An appellate court shall only set aside findings of fact by a jury in a civil matter if there is no material evidence to support the jury's verdict. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006). In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009). With respect to the standard of review regarding the admission of evidence, this Court stated in *DeLapp v. Pratt*:

---

[1] King filed a brief adopting Old Republic's position and argument.

Issues regarding admission of evidence in Tennessee are reviewed for abuse of discretion. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). "[T]rial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Id*. Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

> Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc*., 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id*.

*DeLapp v. Pratt*, 152 S.W.3d 530, 538 (Tenn. Ct. App. 2004). Likewise, a trial court's decision on a motion in limine is subject to the abuse of discretion standard of review. *Allen v. Albea*, 476 S.W.3d 366, 377 (Tenn. Ct. App. 2015). Our Supreme Court has further expanded upon the abuse of discretion standard of review as follows:

This Court has described the abuse of discretion standard in some detail:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below, or to substitute their discretion

-9-

for the lower court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted); *see also BIF, a Div. of Gen. Signals Controls, Inc. v. Serv. Const. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (citations omitted) ("The standard conveys two notions. First, it indicates that the trial court has the authority to choose among several legally permissible, sometimes even conflicting, answers. Second, it indicates that the appellate court will not interfere with the trial court's decision simply because it did not choose the alternative the appellate court would have chosen.").

*Lee Medical* provided the framework for determining whether a trial court has properly exercised its discretion:

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med.*, 312 S.W.3d at 524-25 (citing *Flautt & Mann v. Council of City of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF*, 1988 WL 72409, at *3)); s*ee also Vodafone Americas Holdings, Inc. &*

*Subsidiaries v. Roberts*, 486 S.W.3d 496, 514 (Tenn. 2016).

*Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020). "A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 294 (Tenn. 2017) (internal quotation marks, brackets, and citations omitted).

Insofar as the Trial Court's decision to prevent Old Republic from identifying itself to the jury constituted a jury instruction, the Tennessee Supreme Court has instructed as follows as to the applicable standard of review:

> Whether a jury instruction is erroneous is a question of law and is therefore subject to de novo review with no presumption of correctness. *Solomon v. First Am. National Bank of Nashville*, 774 S.W.2d 935, 940 (Tenn. Ct. App. 1989). The legitimacy of a jury's verdict is dependent on the accuracy of the trial court's instructions, which are the sole source of the legal principles required for the jury's deliberations. Therefore, a trial court is under a duty to impart "substantially accurate instructions concerning the law applicable to the matters at issue." *Hensley v. CSX Transp., Inc.*, 310 S.W.3d 824, 833 (Tenn. Ct. App. 2009) (quoting *Bara v. Clarksville Mem'l Health Sys., Inc.*, 104 S.W.3d 1, 3-4 (Tenn. Ct. App. 2002)). When considering whether a trial court committed prejudicial error in a jury instruction, it is our duty to review the charge in its entirety and consider it as a whole, and the instruction will not be invalidated if it "fairly defines the legal issues involved in the case and does not mislead the jury." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). The judgment of a trial court will not be set aside based on an erroneous jury instruction unless it appears that the erroneous instruction more probably than not affected the judgment of the jury. Tenn. R. App. P. 36(b); *Gorman v. Earhart*, 876 S.W.2d 832, 836 (Tenn. 1994).

*Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 699 (Tenn. 2011).

Having reviewed the applicable standards, we address whether the Trial Court erred by prohibiting Old Republic from presenting evidence of its "unique and specific damages" at trial. Essentially, Old Republic seeks to recover the money it paid to or on behalf of King, an amount that it contends was not covered in full by the jury's verdict. Put another way, Old Republic seeks to recover damages from Defendants that King did not recover from Defendants. In its brief, Old Republic argues:

[A] new trial is warranted to permit Old Republic to present evidence of the damages sustained by Defendants' negligence. Old Republic's ability to present this evidence at trial is of the utmost importance to protect its unique subrogation interest. Put more clearly, evidence of these payments is necessary for Old Republic to recover the medical and disability payments directly from the Defendants.

Old Republic cites to, among other cases, *Blankenship v. Estate of Bain*, 5 S.W.3d 647 (Tenn. 1999). In *Blankenship*, our Supreme Court concluded that "a recipient of benefits under Tennessee's medical assistance program, TennCare, must be 'made whole' for his or her loss before the State may be subrogated under Tenn. Code Ann. § 71-5-117(a)." *Id*. at 653. The High Court discussed the concept of subrogation as follows:

Subrogation is defined as "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." *Castleman Constr. Co. v. Pennington*, 222 Tenn. 82, 432 S.W.2d 669, 674 (1968) (citation omitted). Subrogation allows an insurer to "stand in the shoes" of an insured and assert the rights the insured had against a third party. *E.g., Wimberly v. American Cas. Co.*, 584 S.W.2d 200, 203 (Tenn. 1979). In its most basic form, subrogation means that party A is substituted for party B and is allowed to raise the rights party B had against party C.

A right of subrogation may arise by contract ("conventional subrogation"), by application of equitable principles of law ("legal subrogation"), or by application of a statute ("statutory subrogation"). It is based on two fundamental premises: 1) that an insured should not be permitted recovery twice for the same loss, which would be the potential result if the insured recovers from both its insurer and a tortfeasor; and 2) that the tortfeasor should compensate the insurer for payments the insurer made to the insured. *York v. Sevier County Ambulance Auth.*, 1999 WL 1051166 (Tenn. 1999).

*Blankenship*, 5 S.W.3d at 650. Old Republic emphasizes the language: "[T]he tortfeasor should compensate the insurer for payments the insurer made to the insured." *Id*. at 650 (citing *York v. Sevier Cty Ambulance Auth.*, 8 S.W.3d 616 (Tenn. 1999)). Old Republic also cites to *Wilkerson v. Flying J., Inc.*, No. 3:08-CV-173, 2008 WL 11342564 (E.D. Tenn. Nov. 7, 2008), in which the United States District Judge discussed as follows regarding an insurer's right to participate in a subrogation action:

-12-

The Tennessee Workers' Compensation Act provides that "[i]n the event of such recovery against such third person by the worker ... and the employer's maximum liability for the workers' compensation under this chapter has been fully or partially paid and discharged, the employer shall have a subrogation lien therefor against such recovery, and the employer may intervene in any action to protect and enforce such lien."  Tenn. Code Ann. at § 50-6-112(c)(1).  Tennessee courts have recognized that the "employer, or the employer's workers' compensation carrier, has a right of subrogation" under Tenn. Code Ann. § 50-6-112(c)(1).  *See Hudson v. Hudson Mun. Contractors, Inc.*, 898 S.W.2d 187, 189 (Tenn. 1995).  Thus, American Interstate has provided sufficient notice to the parties as to the grounds asserted in support of its intervention request.  Defendant also contends that the motion should be denied because American Interstate's interests are sufficiently protected by Plaintiffs's presence in this litigation.  Defendant further contends that allowing American Interstate to intervene will complicate this action and increase the expense and length of trial.

***

In *Maricco v. Meco Corp.*, a defendant argued that an insurer could seek relief "through the prompt filing of a separate subrogation claim following the entry of judgment in this action" and that the current plaintiffs would adequately represent the insurer's interests. 316 F.Supp.2d 524, 526 (E.D. Mich. 2004).  The district court rejected this argument because the defendant "failed to identify any support for the proposition that a party with a claimed—and, at this point, undisputed-interest in a potential tort recovery may not intervene so long as there is *any* prospect that an existing party might vindicate this interest. *Id*. (emphasis in original).  The *Maricco* court emphasized that "[w]hile they *might* do so nonetheless, this Court cannot foretell the likelihood that Plaintiffs might instead, perhaps for strategic reasons, seek to downplay or ignore [the insurer's expenses] of their claimed losses."  *Id*. at 526-27 (emphasis in original).  As a result, the insurer "need not run these risks" and "is entitled to participate in this action to ensure that its unique interest as subrogee is properly protected."  *Id*. at 527. Such reasoning is equally applicable to American Interstate in the present case and leads the Court to the same conclusion as in *Maricco*.  Furthermore, the Court disagrees that permitting American Interstate to intervene "unnecessarily" complicates this litigation since American Interstate is entitled to protect its subrogation interests under Tenn. Code Ann. § 50-6-112(c).

*Wilkerson*, 2008 WL 11342564, at *1-2.

-13-

In response to Old Republic's contentions, Defendants assert as follows in their brief:

> Simply stated, [Defendants] are not parties to the insurance policy issued to Darrell King by Old Republic. The contractual benefits due to Darrell King under his insurance policy are irrelevant to the personal injury measure of damages. The only damages recoverable by Darrell King in this matter are the personal injury and property damages proven during the trial of his personal injury case.

Upon our review, we agree with Defendants. While Old Republic accurately cites caselaw reflecting one of the premises for subrogation is that a tortfeasor should compensate an insurer for payments the insurer made to the insured, that does not mean that the insurer has its own cause of action *greater* than that held by the insured. Defendants were not party to King's insurance policy through Old Republic. As ably pointed out by Defendants' counsel at oral arguments, King's insurance policy with Old Republic could have provided for a $500,000 payout if King stubbed his toe—it is of no account to Defendants. Old Republic's ability to recover damages was bounded entirely by what King was able to recover. Subrogation allows an insurer to 'stand in the shoes' of an insured and assert such rights as the insured had against a third party; Old Republic's position would have it stand in one of King's shoes and one of its own shoes at once. That is not subrogation under Tennessee law.

With respect to the *Wilkerson* federal case cited by Old Republic, it does indeed stand for the proposition that an insurer is entitled to participate in an action in which it is subrogee. However, counsel for Old Republic was allowed to participate in voir dire, give opening and closing statements, and examine witnesses. In our judgment, that constitutes participation in a manner consistent with the proposition set out in *Wilkerson*.

Finally, Defendants note that Old Republic declined to make an offer of proof regarding the contractual benefits it paid on behalf of King. This failure by Old Republic is another basis for rejecting its argument concerning its "unique and specific damages." Nevertheless, as we have discussed, Old Republic's damages were no greater than those recoverable by King, which is dispositive of the issue. We affirm the Trial Court as to this issue.

We next address whether the Trial Court erred in keeping Old Republic's identity from the jury. Old Republic argues that it should be allowed "to prosecute this action in its own name with jury instructions regarding Old Republic's role in the overall matter to ensure its unique subrogation interest [is] protected." Old Republic cites Tenn. R. Civ. P.

17.01, which provides: "Every action shall be prosecuted in the name of the real party in interest…." Old Republic further cites the Tennessee Supreme Court for the proposition that "[u]pon payment by the insurer of a loss, it becomes the real party in interest with respect to the subrogation claim, and has the right to bring suit in the name of the insured, or in its own name." *Travelers Ins. Co. v. Williams*, 541 S.W.2d 587, 590 (Tenn. 1976) (internal citations omitted). However, while Old Republic's subrogation interest may be "unique," it provides no greater cause of action for damages than that held by King. Old Republic stood in King's shoes and its recovery was defined entirely by that which was recoverable by King. If anything, revealing Old Republic's identity to the jury could have rendered the issues at trial murkier rather than clearer as Old Republic's payment on its policy to or on behalf of King had no bearing on what if any damages were incurred by King as a result of the accident.[2] We find no reversible error in the Trial Court's decision to prevent Old Republic from revealing its identity to the jury.

Continuing our review of Old Republic's issues, we next address whether the Trial Court erred by permitting Defendants to present evidence of King's nonpayment of income taxes at trial. As pertinent, Old Republic argues that "Defendants had no basis to introduce this evidence other than to prejudice Mr. King in the eyes of the jury." As pertinent to this issue, Tenn. R. Evid. 401 provides:

> **Rule 401. Definition of "relevant evidence."**—"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 provides:

> **Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.**—Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. As this Court noted in *Goodale v. Langenberg*: "[W]e have observed that the plain language of the rules strongly suggests that when the balance between the evidence's probative value and any prejudicial effect is close, the evidence should be admitted. Therefore, excluding relevant evidence under rule 403 is an extraordinary step

---

[2] We cannot help but note the irony of Old Republic fighting so vigorously to have the jury know that it, an insurance company, and not its insured, King, is the real party in interest.

that should be used sparingly." *Goodale v. Langenberg*, 243 S.W.3d 575, 587 (Tenn. Ct. App. 2007) (internal quotation marks and citations omitted).

King claimed as damages, in part, a loss of wages. Therefore, whether King paid income taxes was relevant to establishing what his earning capacity actually was in light of his obligation to pay taxes on his prior earnings. To be sure, evidence of King's failure to file income tax returns was "prejudicial" to King in the sense it hurt his case. However, the probative value of this evidence substantially exceeded any prejudicial effect, and indeed went to the heart of King's claim for lost wages. The Trial Court's decision to permit the introduction of evidence concerning King's nonpayment of taxes is subject to the highly deferential abuse of discretion standard of review. Under this standard, we are not to substitute our judgment for that of a trial court. We find that the Trial Court did not apply an incorrect legal standard; did not reach an illogical or unreasonable decision; and did not base its decision on a clearly erroneous assessment of the evidence. We find further that the factual basis for the Trial Court's decision is properly supported by evidence in the record; that the Trial Court properly identified and applied the most appropriate legal principles applicable to the decision; and the Trial Court's decision was within the range of acceptable alternative dispositions. We find further still that the Trial Court's decision to admit this evidence did not cause an injustice toward the party complaining, Old Republic. In short, the Trial Court did not abuse its discretion. We affirm the Trial Court on this issue.

The final issue we address is whether the jury returned a verdict contrary to the weight of the evidence by ignoring uncontradicted expert proof of King's injuries and damages. The jury's award for medical damages encompassed only King's initial emergency room treatment. Old Republic argues: "Despite the undisputed medical expert proof by Dr. Chrabuszcz, the jury returned a verdict of zero left ankle medical damages…the verdict is contrary to the weight of the evidence and a new trial on damages is required." Regarding a jury's prerogative to reject expert testimony, this Court has stated: "[T]he trier of fact is not bound to accept an expert witness's testimony as true, and it may reject any expert testimony that it finds to be inconsistent with the credited evidence or is otherwise unreasonable." *Roach v. Dixie Gas Co.*, 371 S.W.3d 127, 150 (Tenn. Ct. App. 2011) (citing *Dickey v. McCord*, 63 S.W.3d 714, 720-21 (Tenn. Ct. App. 2001)). Nevertheless, Old Republic cites to, among other cases, *Wilhoit v. Rogers*, No. E2012-00751-COA-R3-CV, 2013 WL 3717425, at *11 (Tenn. Ct. App. July 12, 2013), *R. 11 perm. app. denied November 13, 2013*, an automobile accident case in which a jury declined to award medical damages despite unrefuted expert testimony. This Court stated:

It is well settled that a jury is not justified in ignoring the "unimpeached, uncontradicted testimony of a physician in respect to scientific information of which a layman would not be expected to have any

reliable knowledge." *Reserve Life Ins. Co. v. Whittemore*, 59 Tenn. App. 495, 442 S.W.2d 266, 275 (Tenn. Ct. App. 1969). Defendants, in their brief on appeal, reiterate credibility concerns surrounding the testimony of Ms. Wilhoit. Such concerns do not appear to relate to the breast injury. Defendants point to no refutation of the expert testimony of Dr. Broyles and Dr. Foley regarding the ruptured encapsulation and its cause. In similar personal injury cases where the jury has apparently overlooked or ignored uncontroverted expert proof that an injury was sustained, thereby returning a verdict of zero or other inadequate amount of damages, this Court has determined that the jury's verdict was not supported by material evidence and accordingly remanded the cases for a new trial on the issue of damages only. *See Fuller* [*v. Speight*], 571 S.W.2d [840] at 841 [(Tenn. Ct. App. 1978)]; *Loftis v. Finch*, 491 S.W.2d 370, 377 (Tenn. Ct. App. 1972); *Taylor v. Smith*, No. E2002-01158-COA-R3-CV, 2003 WL 21487112 at \*3-4 (Tenn. Ct. App. June 24, 2003); *Dent v. Holt*, No. 01-A-01-9302-CV-00072, 1994 WL 440916 at \*2-3 (Tenn. Ct. App. Aug. 17, 1994). As in *Dent*, "[t]he discrepancy between [the plaintiff's] proof of damages and the jury's verdict stands forth like a beacon in this case." 1994 WL 440916 at \*2.

\*\*\*

In this case, it was undisputed that Ms. Wilhoit suffered an injury in the accident that caused the encapsulation around her breast implants to rupture, allowing silicone to migrate to outside tissues and cause a severe inflammatory reaction. As a result, Ms. Wilhoit suffered pain and disfigurement, and underwent medical examinations, testing, and a painful surgical procedure. She also incurred reasonable and necessary medical expenses related thereto. Despite undisputed expert proof of injury, causation, and harm, however, the jury awarded Ms. Wilhoit absolutely no damages. We conclude that there is no material evidence to support such an award.

*Wilhoit*, 2013 WL 3717425, at \*10, 13. In *Wilhoit*, we clarified that "[t]his case is distinguishable from *Roach*, however, because Ms. Wilhoit's breast injury was objectively verified and not refuted by any other proof." *Id*. at \*14. Defendants argue that in this case, by contrast, "[t]here was substantial direct and circumstantial evidence to support the lack of injury [to King]."

With all due respect to King, the evidence for his alleged ankle injury is not akin to the evidence for the breast injury described in *Wilhoit*. In that case, we described an "objectively verified" injury "not refuted by any other proof," *Wilhoit*, 2013 WL 3717425,

-17-

at *14, featuring "disfigurement" and involving a "painful surgical procedure." *Id*. at *13. Here, the jury had an evidentiary basis for arriving at the conclusion it did. This evidence included but is not limited to King telling Woody he was okay; King telling a Tennessee Highway Patrol Officer he did not require medical assistance; and King's waiting around the accident site for four hours without complaint or obvious sign of injury. There is no discrepancy in this case between the verdict and the proof of damages of the sort we referred to in *Wilhoit* as "stand[ing] forth like a beacon." *Id*. at *10 (quoting *Dent v. Holt*, No. 01-A-01-9302-CV00072, 1994 WL 440916 at *2 (Tenn. Ct. App. Aug. 17, 1994)). Under these circumstances, it was the jury's prerogative as articulated in *Roach* to reject Dr. Chrabuszcz's expert testimony and award King zero damages for his left ankle. The jury's verdict was supported by material evidence and properly approved by the Trial Court in its role as thirteenth juror. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Old Republic Life Insurance Company, and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE